No. 24-2755

# IN THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

MARCUS MITCHELL,

*Plaintiff-Appellant,*

v.

KYLE KIRCHMEIER, MORTON COUNTY SHERIFF, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the District of North Dakota
Case No. 1:19-CV-149
The Honorable Judge Daniel M. Traynor

## OPENING BRIEF OF APPELLANT MARCUS MITCHELL

Vanessa del Valle
RODERICK & SOLANGE
  MACARTHUR JUSTICE
  CENTER
NORTHWESTERN
  PRITZKER SCHOOL
  OF LAW
375 East Chicago Ave.
Chicago, IL 60611

Shubra Ohri
RODERICK & SOLANGE
  MACARTHUR JUSTICE
  CENTER
906 Olive St., Ste. 420
Saint Louis, MO 63101

Devi M. Rao
RODERICK & SOLANGE
  MACARTHUR JUSTICE
  CENTER
501 H St. NE, Ste. 275
Washington, DC 20002
(202) 869-3490
devi.rao@macarthurjusti
ce.org

*Counsel for Appellant Marcus Mitchell*

**ORAL ARGUMENT REQUESTED**

## RULE 28A(i)(1) SUMMARY AND ORAL ARGUMENT STATEMENT

While peacefully protesting the Dakota Access Pipeline project, Marcus Mitchell committed at most two misdemeanors: trespassing and obstructing a government function; did not pose a threat in any way; and was not fleeing or resisting arrest. Still, Defendant officers singled him out and fired "bean-bag" rounds at him, shattering the orbital wall of his eye and cheekbone and causing him lasting damage.

On remand from this Court, s*ee Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022), the district court granted Defendants' motions for summary judgment, concluding both that (1) no triable issues existed as to the merits of Mr. Mitchell's excessive force claim, and (2) even if there were, the law was not clearly established.

The district court failed to view the record in the light most favorable to Mr. Mitchell, and made several additional legal errors in its analysis. Correcting these errors requires no more than straightforward applications of this Court's caselaw; however, given the voluminous record, this Court may find oral argument to be helpful. In light of the importance of this case, and the pervasiveness of the district court's error, Appellant respectfully requests twenty minutes of oral argument.

# TABLE OF CONTENTS

RULE 28A(i)(1) SUMMARY AND ORAL ARGUMENT STATEMENT ... i

TABLE OF AUTHORITIES .................................................................... iv

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF ISSUES ....................................................................... 1

STATEMENT OF THE CASE ................................................................. 2

I.  Factual Background ........................................................................ 2

II.  Procedural Background .................................................................. 15

SUMMARY OF ARGUMENT ................................................................ 21

ARGUMENT ......................................................................................... 24

STANDARD OF REVIEW ...................................................................... 24

I.  The district court erred in concluding no genuine issues of
    material fact exist on Mr. Mitchell's excessive force claim,
    because it viewed the evidence in the light most favorable to
    Defendants. ................................................................................... 24

    A.  The legal framework. .............................................................. 24

    B.  A jury could conclude that a reasonable officer would not
    think Mr. Mitchell was engaged in "serious crimes." ............... 27

    C.  A jury could conclude that a reasonable officer would not
    think Mr. Mitchell posed an immediate threat to officer
    safety at the moment he was shot. .......................................... 36

    D.  A jury could conclude a reasonable officer would not think
    Mr. Mitchell was actively resisting arrest or attempting to
    evade arrest by flight. ............................................................. 45

    E.  A jury could conclude that the force used was excessive
    based on the severity of Mr. Mitchell's injury. ....................... 51

    F.  The district court's "other relevant circumstances" analysis
    was erroneous, and does not prevent Mr. Mitchell's claim
    from being heard by a jury. .................................................... 52

II.  The district court erred in granting qualified immunity to
    Defendants Piehl and Welk on Mr. Mitchell's excessive force
    claim. .......................................................................................... 57

III. The district court erred in granting summary judgment on Mr. Mitchell's claims against Sergeant Kennelly, Sheriff Kirchmeier, and Morton County. ...................................................... 62

CONCLUSION ....................................................................................... 62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baude v. Leyshock,*
  23 F.4th 1065 (8th Cir. 2022) ............................................................... 32

*Bauer v. Norris,*
  713 F.2d 408 (8th Cir. 1983) ......................................................... 35, 44

*Bell v. Kansas City Police Dep't,*
  635 F.3d 346 (8th Cir. 2011) ................................................................ 26

*Bernini v. City of St. Paul,*
  665 F.3d 997 (8th Cir. 2012) ................................................................ 59

*Boudoin v. Harsson,*
  962 F.3d 1034 (8th Cir. 2020) ............................................................. 49

*Brown v. City of Golden Valley,*
  574 F.3d 491 (8th Cir. 2009) ................................................... 40, 41, 48

*Carpenter v. Gage,*
  686 F.3d 644 (8th Cir. 2012) ......................................................... 50, 51

*Cockrell v. City of Cincinnati,*
  468 F. App'x 491 (6th Cir. 2012) ........................................................ 48

*Dundon v. Kirchmeier,*
  85 F.4th 1250 (8th Cir. 2023) .............................................................. 61

*Ehlers v. City of Rapid City,*
  846 F.3d 1002 (8th Cir. 2017) ............................................................. 50

*Graham v. Connor,*
  490 U.S. 386 (1989) .............................................................. 1, 36, 53

*Johnson v. Carroll,*
  658 F.3d 819 (8th Cir. 2011) ......................................................... 35, 57

*Kelsay v. Ernst,*
933 F.3d 975 (8th Cir. 2019)............................................................50

*Marks v. Bauer,*
107 F.4th 840 (8th Cir. 2024) ....................................................*passim*

*McDaniel v. Neal,*
44 F.4th 1085 (8th Cir. 2022) ........................................................51

*McKenney v. Harrison,*
635 F.3d 354 (8th Cir. 2011)............................................................49

*Mitchell v. Kirchmeier,*
28 F.4th 888 (8th Cir. 2022) ......................................................*passim*

*Molina v. City of St. Louis,*
59 F.4th 334 (8th Cir. 2023) ...........................................................44

*Monell v. Dep't of Soc. Servs.,*
436 U.S. 658 (1978) .......................................................................17

*Montoya v. City of Flandreau,*
669 F.3d 867 (8th Cir. 2012).......................................................*passim*

*Nieters v. Holtan,*
83 F.4th 1099 (8th Cir. 2023) ....................................................*passim*

*Peterson v. Kopp,*
754 F.3d 594 (8th Cir. 2014)............................................................48

*Poemoceah v. Morton Cnty.,*
117 F.4th 1049 (8th Cir. 2024) ...................................................47, 58

*Rokusek v. Jansen,*
899 F.3d 544 (8th Cir. 2018).......................................................35, 48

*Shannon v. Koehler,*
616 F.3d 855 (8th Cir. 2010)............................................................44

*Small v. McCrystal,*
708 F.3d 997 (8th Cir. 2013).................................................26, 34, 47

*Speer v. City of Wynne,*
276 F.3d 980 (8th Cir. 2002)..................................................................62

*State v. Bearrunner,*
912 N.W.2d 894 (N.D. 2019)................................................................34

*Tatum v. Robinson,*
858 F.3d 544 (8th Cir. 2017)................................................35, 41, 48

*Tolan v. Cotton,*
572 U.S. 650 (2014).................................................................................57

*Westwater v. Church,*
60 F.4th 1124 (8th Cir. 2023) ........................................25, 26, 42, 56

*White v. Jackson,*
865 F.3d 1064 (8th Cir. 2017)..............................................................55

*Zubrod v. Hoch,*
907 F.3d 568 (8th Cir. 2018)..........................................................48, 49

## Statutes

28 U.S.C. § 1291.............................................................................................1

28 U.S.C. § 1331.............................................................................................1

28 U.S.C. § 1343(a)(3)...................................................................................1

28 U.S.C. § 1367(a) .......................................................................................1

42 U.S.C. § 1983.....................................................................................1, 15

N.D. Cent. Code § 12-1-22-03...................................................................18

N.D. Cent. Code § 12.1-08-01..........................................................18, 31

N.D. Cent. Code § 12.1-21-05...................................................................30

N.D. Cent. Code § 12.1-25-01...................................................................34

N.D. Cent. Code § 12.1-25-03...................................................................34

N.D. Cent. Code § 24-03-05 ....................................................... 31

**Other Authorities**

Pretrial Diversion Agreement, *State v. Mitchell*, No. 30-2017-
CR-96 (Morton Cnty. Nov. 5, 2018) ..................................................... 33

Second Amended Criminal Complaint, *State v. Mitchell*, No.
30-2017-CR-96 (Morton Cnty. Feb. 10, 2017) .............................. 18, 33

# JURISDICTIONAL STATEMENT

Plaintiff-Appellant brought this action under 42 U.S.C. § 1983, alleging violations of his First, Fourth, and Fourteenth Amendment rights and state law. R.Doc. 1, at 1-3. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), and 1367(a). It entered a final order granting summary judgment on all claims on July 30, 2024, R.Doc. 129, and an amended order on August 1, 2024, App.1117, R.Doc. 134; *see also* App.1116, R.Doc. 130 (amended judgment). On August 28, 2024, Mr. Mitchell timely appealed. App.1143, R.Doc. 135. This court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

(1) Whether a jury could conclude that officers used excessive force in violation of the Fourth Amendment when they fired less-lethal "bean bag" rounds at Mr. Mitchell, who was suspected of no more than trespassing and obstructing a government function, both misdemeanors; was not posing a threat of harm; and was not fleeing or attempting to evade arrest.

- *Graham v. Connor*, 490 U.S. 386 (1989)

- *Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022)

- *Nieters v. Holtan*, 83 F.4th 1099 (8th Cir. 2023)

(2)   Whether the district court erred in granting qualified immunity on Mr. Mitchell's excessive force claim in light of clearly established law that it is unreasonable for an officer to use more than *de minimis* force against a person who is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest.

- *Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022)

- *Marks v. Bauer*, 107 F.4th 840 (8th Cir. 2024)

## STATEMENT OF THE CASE

## I.   Factual Background[1]

In November 2016, Marcus Mitchell, a member of the Navajo Nation, traveled to North Dakota to stand in solidarity with the Standing Rock Sioux Tribe as they peacefully protested against the Dakota Access Pipeline ("DAPL"). App.167, 177, R.Doc. 111-4, at 83, 93 (82:13-21; 92:18-

---

[1] Because the district court consistently erred in failing to view the evidence and draw all reasonable inferences in the light most favorable to Mr. Mitchell, the non-moving party, *see Montoya v. City of Flandreau*, 669 F.3d 867, 870-71 (8th Cir. 2012), this factual recitation is drawn directly from the summary judgment record.

25). The protesters called themselves "water protectors," and believed the DAPL violated the 1851 and 1868 Fort Laramie Treaties. To them, the area around the Backwater Bridge was unceded land unlawfully taken from the Great Sioux Nation. App.984, R.Doc. 111-19, at 2.[2]

Law enforcement erected a barricade on the north end of the Backwater Bridge. App.183, R.Doc. 111-4, at 99 (98:18-99:6). Officers would periodically shoot tear gas, bear spray, water cannons and "less-lethal" ammunition like "bean bag" and "sponge" rounds at protesters who gathered at the barricade, even when they had their arms raised above their head. *See* App.192-96, 223-24, 294-95, R.Doc. 111-4, at 108-12, 139-40, 210-11 (107:9-111:20, 138:2-139:2, 209:7-210:13) (Mr. Mitchell describing force used); App.492, R.Doc. 111-5, at 33 (123:11-124:25) (Welk testifying regarding same); App.985, R.Doc. 111-20 (video of tear gas flooding protesters on barricade). Some of the protesters took to wearing gas masks and carrying shields to protect themselves from

---

[2] Defendant Kirchmeier and other law enforcement were on notice of the disputed status of the Backwater Bridge. In fact, they specifically understood that the Treaty of Fort Laramie put into question whether water protectors considered their presence on the land as trespassing and they understood that whether the water protectors were lawfully on the bridge turned on Treaty interpretation. App.984, R.Doc. 111-19 at 2.

these uses of force. *See, e.g.*, App.265, 361-62, R.Doc. 111-4, at 181, 277-78 (180:9-12, 276:15-277:5) (Mr. Mitchell testifying protesters held "shields to protect themselves" and "to protect the . . . women and elders that were on the bridge peacefully praying"); App.287-88, R.Doc. 111-4, at 203-04 (202:22-203:22) (Mr. Mitchell noting medics at the protest camp had gas masks because officers shot CS gas canisters at protesters).

The "less-than-lethal" "bean bag" munitions are "very accurate" from a distance of up to 75 feet, but should not be used under 20 feet at the risk of "penetrating trauma." App.906-07, 909-10, R.Doc. 111-17, at 16-17, 19-20 (56:14-57:14, 68:22-69:7). Officers who were trained on the use of these munitions were instructed that there is no justification for deploying them upon a passively non-compliant suspect who is not physically resisting. *See, e.g.*, App.996, R.Doc. 111-22, at 11; App.907-08, R.Doc. 111-17, at 17-18 (57:15-61:6). And if the use of less lethal munitions is justified, officers were trained to shoot in the "buttocks, thigh, [or] calf" and instructed to avoid the "chest, spine, head, or neck" because the latter "could cause serious or fatal injury." App.906, R.Doc. 111-17, at 16 (54:17-55:19).

On January 16, 2017, Mr. Mitchell went to Backwater Bridge for the first time in order to assist medics with an injured protester at the barricade. App.207-08, 211-12, R.Doc. 111-4, at 123-24, 127-28 (122:9-123:20, 126:11-127:7). As he attempted to reach the protester, law enforcement at the barricade fired "sponge" round projectiles at him and he was hit in the chest. App.218-21, R.Doc. 111-4, at 134-37 (133:13-136:16). Other medics were able to reach the injured protester and they and Mr. Mitchell helped him off the bridge and back to camp. App.221, R.Doc. 111-4, at 137 (136:7-16). Mr. Mitchell returned to the bridge and approached the barricade where officers were shooting at protesters standing with their hands in the air. App.223-24, R.Doc. 111-4, at 139-40 (138:19-139:2). His medic helmet was shot off his head. App.234, R.Doc. 111-4, at 150 (149:1-6). Once at the barricade, Mr. Mitchell cut and removed concertina wire and brought it with him when he returned to the camp. App.234, R.Doc. 111-4, at 150 (149:21-24).

Mr. Mitchell returned to the bridge the next day, January 17. App.277, R.Doc. 111-4, at 193 (192:1-4). Law enforcement proceeded south of the barrier that night, shooting "bean bag" and "sponge" rounds at the protesters. App.284, R.Doc. 111-4, at 200 (199:5-8). Mr. Mitchell

was hit with these munitions in the chest and shoulder. App.284, R.Doc. 111-4, at 200 (199:9-18).

On the night of January 18, Mr. Mitchell again accompanied a group of medics up to Backwater Bridge. App.292, R.Doc. 111-4, at 208 (207:15-20). The number of protesters on the bridge that night varied between 10-75 people; officers outnumbered the protestors, with estimates ranging from 100 to 300 law enforcement officers, from more than half a dozen different law enforcement agencies. App.303, R.Doc. 111-4, at 219 (218:13-22); App.518, R.Doc. 111-5, at 59 (228:2-13); App.1057, R.Doc. 111-43, at 27 (98:21-25); App.614, R.Doc. 111-7, at 16 (53:9-54:18). The protesters stood on and behind the barricade, talking, praying, and chanting. App.696, R.Doc. 111-9, at 1:22-4:05, 16:00 (protesters smudging themselves; protester beating a drum and others keeping the beat); App.698, R.Doc. 111-11 at 9:30-13:00 (same); App.699, R.Doc. 111-12, at 3:00-3:30 (drum and chanting audible).

Around 11:25 p.m., Defendant Sergeant Kennelly, who was the on-scene commander, App.623, R.Doc. 111-7, at 25 (91:14-24), and Lieutenant Stugelmeyer approached the barricade and spoke with the protesters for approximately 13 minutes to negotiate returning a flag and

teepee taken by law enforcement in exchange for protesters leaving the bridge, R.Doc. 101-1, at 1; App.696, R.Doc. 111-9, at 26:33-30:11; App.698, R.Doc. 111-11, at 0:00-8:13. After the completion of this exchange, Kennelly and Stugelmeyer returned less than 10 minutes later and asked whether protesters would move off the bridge if law enforcement returned poles from their dismantled teepee. App.699, R Doc. 111-12, at 16:10-17:59; App.629, R.Doc. 111-7, at 31 (113:14-23). A protester expressed fear that the officers would "snatch" them from the barricade; Kennelly responded, "We're not going to snatch you." App.699, R.Doc. 111-12, at 16:38-16:47. Stugelmeyer told the protesters he and Kennelly were there to "do this in good faith" and they "didn't want a confrontation." App.699, R.Doc. 111-12, at 17:44-17:49. The protesters declined the return of the poles, stating "all [they] want to do is stand in prayer." App.699, R.Doc. 111-12, at 17:49-18:03. When Stugelmeyer objected, one protester asked "Why not?" App.699, R.Doc. 111-12, at 18:08-18:09. Kennelly only responded "Why can't you pray back there?," indicating off the bridge. App.699, R.Doc. 111-12, at 18:10.

Ultimately Kennelly and Stugelmeyer agreed to let the protesters continue their prayer at the barricade and walked away, making no

mention to the protesters that they were subject to arrest. App.699, R.Doc. 111-12, at 18:30-18:41 (Kennelly telling the protesters they were "going to hold back" and to "stay here and do your prayer"); App.313, R.Doc. 111-4, at 229 (228:10-25) (Mr. Mitchell testifying that Kennelly said "Do not cross the barricade and we will not shoot you. You can stay here in peaceful prayer, we will not bother you."). And although Kennelly and other officers maintained in their depositions that, even if they were not instigating violence, all of the protesters were "arrestable" "just by their presence" on Backwater Bridge, App.626, R.Doc. 111-7, at 28 (103:17-25, 104:13-15); App.516, R.Doc 111-5, at 57 (217:13-21), no officer communicated to protesters that the police planned to imminently arrest them (and use less-lethal force to effectuate that arrest), *compare* R.Doc. 95-3[3], at 5:27-5:40 ("Know the Truth" video from January 16 with alleged "amplified warning" that protesters were "all trespassing" and ordering them to leave) *with* App.699, R.Doc. 111-12 (video from January 18 with no warnings from law enforcement regarding trespassing, arrest, or potential use of force at all).

---

[3] Video provided to the court under separate cover.

8

There were no reports and no video evidence that Mr. Mitchell was physically aggressive during any officers' interactions with him. App.747, 751, R.Doc. 111-13, at 48, 52 (183:5-8, 200:13-25); App.933, R.Doc. 111-17, at 43 (161:2-5); *see also* App.699, R.Doc. 111-12. Kennelly testified that Mr. Mitchell specifically did not "do anything that evening that would . . . qualify him as an agitator," meaning "[o]ne that is instigating violence." App.619, 630, R.Doc. 111-7, at 21, 32 (75:23-76:8, 117:5-8). And Stugelmeyer remarked that Mr. Mitchell was just "a listener to what was being said" during the negotiation. App.746, R.Doc. 111-13, at 47 (178:15-17).

Less than thirty minutes after Kennelly and Stugelmeyer left protesters to their peaceful prayer, and without any warning, officers came around the west side of the barricade and "pushed" towards the protesters. App.697, R.Doc. 111-10, at 14:18-16:37; App.699, R.Doc. 111-12, at 23:46-27:00. Kennelly testified that he "ordered [the first] push" because he received permission from the Tactical Operation Command "[t]o effect the arrest of all those remaining in the area." App.626, R.Doc. 111-7, at 28 (104:8-15). As several officers testified, before officers charged, protesters were not violent or threatening, App.517, R.Doc. 111-

5, at 58, (223:13-20); App.639, R.Doc. 111-7, at 41 (155:17-23),[4] and Mr. Mitchell in particular wasn't even at the barricade any longer, having walked toward the south end of the bridge about two minutes after the last negotiation concluded, App.698, R.Doc. 111-11, at 20:30-21:30.

Yet officers—giving no warnings or commands—indiscriminately fired "sponge" rounds, "bean bag" rounds, pepper spray, and tear gas into the protesters' midst. *See* App.699, R.Doc. 111-12, at 23:46-27:00 (officers advancing largely silently, shooting gas and "bean bag" rounds); App.361-63, R.Doc. 111-4, at 277-79 (276:15-278:11); App.516, R.Doc. 111-5, at 57 (218:3-10) (Welk noting he can't recall any "specifically verbal" warning given to protesters before the first push).

As the officers advanced, protesters can be heard pleading with them to "stop shooting," and crying out, "you said you were gonna let us pray." App.699, R.Doc. 111-12, at 25:40-27:07. Officers made some arrests as they continued to push protesters south of the Backwater Bridge, but most of the protesters, including Mr. Mitchell, moved or remained further south of the bridge to be out of firing range and to be

---

[4] Indeed, one officer who participated in the pushes testified that none of the pushes were necessary that night, and actually escalated the situation. App.1059, R.Doc. 111-43, at 29 (108:23-25).

safe from tear gas exposure. App.318-19, R.Doc. 111-4, at 234-35 (233:8-234:6); *see also* App.699, R.Doc. 111-12, at 26:16-49:14 (protesters backing down the bridge as officers advance).

After the push was completed, protestors stood about 20 yards in front of officers. App.699, R.Doc. 111-12, at 50:00-58:45. Some, including Mr. Mitchell, held shields to protect women and elders. App.362, R.Doc. 111-4, at 278 (277:3-5); App.699, R.Doc. 111-12, at 53:25-58:45 (protester yells to officers, "I'm an elder"; officer responds, "I don't care"). Mr. Mitchell was not threatening, violent, or fleeing. App.922-24, R.Doc. 111-17, at 32-34 (120:21-121:10, 124:25-125:5); App.531, R.Doc. 111-5, at 72 (279:25-20). Still, officers singled Mr. Mitchell out for targeting. App.699, R.Doc. 111-12, at 57:54-58:19 (unknown officer stating "the next one is standing right to the right of that 'Water is Life' sign," indicating Mr. Mitchell).

Law enforcement eventually returned to the north side of the barricade, with protesters again on the south side. App.699, R.Doc. 111-12, at 1:00:03. Sometime later, Kennelly ordered a second "push." App.632, R.Doc. 111-7, at 34 (128:15-23). Law enforcement again pushed forward toward the south end of the bridge and stopped, about 18 or 20

yards from where protesters were then standing, singing, drumming, and dancing. App.699, R.Doc. 111-12, at 1:13-48-1:15:44, 1:16:00-1:16:50, 1:19:16-1:20-25; *see also* App.921, R.Doc. 111-17, at 31 (113:11-13) (Piehl testifying he was about 18 to 20 yards from Mr. Mitchell). Mr. Mitchell stood still on the east side of the bridge behind a clear shield. App.699, R.Doc. 111-12, at 1:19:16-1:20-25.

Defendant officers George Piehl and Tyler Welk were instructed to target Mr. Mitchell for arrest, App.923-24, R.Doc. 111-17, at 33-34 (124:17-127:10), and ordered to shoot less-than-lethal munitions at Mr. Mitchell. App.523, R.Doc. 111-5, at 64 (246:5-18). Although Piehl had not used "bean bag" munitions prior to the DAPL protests in January 2017, both he and Welk had been trained in their use. App.904, R.Doc. 111-17, at 14 (47:8-48:8); App.489, R.Doc. 111-5, at 30 (109:20-110:23). Piehl even deployed these less-lethal munitions earlier in the protest—twice shooting protestors in the legs. App.912, R.Doc. 111-17, at 22 (77:10-78:16) (shot protestor who was "trying to get away when they were trying to arrest him" "because he threw [a] shield" at officers and "could have injured one of us"); App.926, R.Doc. 111-17, at 36 (133:18-134:9) (shot

protestor who "is trying to run away" after "throwing [an] ice chunk" which "could have hurt me").

Piehl and Welk were both instructed to target Mr. Mitchell, App.924, R.Doc. 111-17, at 34 (127:4-10), even though both acknowledged that Mr. Mitchell was not threatening or violent, App.937, R.Doc. 111-17, at 47 (177:4-13); App.531, R.Doc. 111-5, at 72 (279:25-280:20), and both admit that Mr. Mitchell was not given a warning, nor provided the option to surrender,[5] App.926-27, R.Doc. 111-17, at 34-35 (128:24-129:3); App.524, R.Doc. 111-5, at 65 (251:11-23).

Without any warning, Piehl and Welk took aim at Mr. Mitchell and they and other officers fired a volley of less-lethal munitions and charged the protesters.[6] App.926-27, R.Doc. 111-17, at 34-35 (128:24-129:3);

---

[5] Even though Mr. Mitchell was not told he was under arrest, and not given the opportunity to surrender, he may have attempted to surrender when he "put [his] hands up in the air and [] put the shield down again." App.333-34, R.Doc. 111-4, at 249-50 (248:23-249:3).

[6] Although Mr. Mitchell's complaint references a countdown before shots were fired, he does not remember if there actually was one. App.325-26, R.Doc. 111-4, at 241-42 (240:18-241:5). No officer testified that there was a countdown to the use of force, and while Piehl says he remembers "some countdown," he did not remember who counted down or how they counted (ex. "1, 2, 3" or "ready, set go"). App.921, R.Doc. 111-17, at 31 (114:11-17). And in the video, right before officers open fire, an unknown law enforcement officer says, "Got your target(s)? Ok, ready, go"; clearly a

App.699, R.Doc. 111-12, at 1:20:31. Mr. Mitchell was hit with four "bean bag" rounds. App.331-36, R.Doc. 111-4, at 247-252 (246:20-251:17). The first round hit Mr. Mitchell's shield which he dropped to put his hands up, and then picked up again. App.334, R.Doc. 111-4, at 250 (249:5-9). The second shot hit him in the left eye, shattering the orbital wall of his eye and cheekbone, and ripping open a flap of skin nearly to his left ear. App.334, 419, R.Doc. 111-4, at 250, 335 (249:13-15, 334:2-14); App.1123, R.Doc. 134, at 7 n.8. The shot to his face spun him so he was facing south and so the third round hit him in the back of the head. App.336, R.Doc. 111-4, at 252 (251:4-8). A final "bean bag" round hit him in the back of his leg. App.336, R.Doc. 111-4, at 252 (251:8-9). With blood rushing down his face, an officer tackled him face first in the snow. App.327, R.Doc. 111-4, at 243 (242:9-12). Blood filled Mr. Mitchell's nostrils as several officers descended upon him, kneeing him in the head and his back. App.327, R.Doc. 111-4, at 243 (242:13-19). Mr. Mitchell struggled to tell

---

countdown for *law enforcement*, not protesters. App.699, R.Doc. 111-12, at 1:20:26. In any event, this fact must be construed in the light most favorable to Mr. Mitchell: that no audible countdown was given to warn protestors of the imminent use of force.

officers that he could not breathe as he began drowning in a small pool of his own blood. App.327, R.Doc. 111-4, at 243 (242:20-24).

Piehl maintains that he aimed at Mr. Mitchell's leg—not his face—because that's what he could see. App.921, R.Doc. 111-17, at 31 (113:7-17). But because the arrest team ran out in front of him, he does not know if his or Welk's shots hit Mr. Mitchell. App.921, R.Doc. 111-17, at 31 (113:18-114:10).

As a result of getting shot in the face with a "bean bag" round, Mr. Mitchell is blind in his left eye, his hearing and sense of smell are irreparably damaged, and he has chronic, debilitating pain on the left side of his face despite several medical procedures. App.410, 442, 444-47, R.Doc. 111-4, at 326, 332, 334-37 (325:8-11, 331:14-17, 333:15-336:14).

## II.  Procedural Background

Mr. Mitchell filed a civil rights suit under 42 U.S.C. § 1983 in the U.S. District Court for the District of North Dakota. He named the four officers who fired directly at him: Morton County Sheriff's Corporal George Piehl, Bismarck Police Officer Tyler Welk, and John Does 1-2. R.Doc. 1. He also named Morton County and the Morton County Sheriff, Kyle Kirchmeier, in his official capacity. *Id.* And he named North Dakota

Highway Patrol Sergeant Benjamin Kennelly, the "scene commander" acting under Kirchmeier's direction when Mr. Mitchell was shot. *Id.*; *id.* at 11.

As relevant here, Mr. Mitchell alleged that the officers who fired at him violated his Fourth Amendment right to be free from excessive force; that Morton County was liable for this violation under a theory of municipal liability; and that Kennelly was also liable for failing to intervene. *Id.* at 29-39.

The district court dismissed all of Mr. Mitchell's claims as to all Defendants with prejudice. R.Doc. 38.

This Court reversed the district court's dismissal of Mr. Mitchell's excessive force claims. *Mitchell v. Kirchmeier*, 28 F.4th 888, 899 (8th Cir. 2022) (*Mitchell I*). Applying the three-factor test from *Graham*, this Court observed that "we have held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him." *Id.* at 898 (collecting cases). The Court also held that "[i]t is 'clearly established' that the use of more than *de minimis* force in circumstances like these violates the Fourth

Amendment." *Id.* This is true, the Court went on, "regardless of whether one is aiming at the person's face" because "to fire a shotgun loaded with a lead-filled bean bag at a person . . . is to use more than *de minimis* force." *Id.* at 899. "[T]he severity of Mitchell's injuries confirms" that. *Id.* at 898. The Court ultimately held that "because it was clearly established that the alleged conduct violated Mr. Mitchell's Fourth Amendment rights," the shooting officers were not entitled to qualified immunity. *Id.* at 899.

The Court also concluded that Mr. Mitchell stated a municipal liability claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). 28 F.4th at 901. Finally, the Court held that Mr. Mitchell stated a claim that Sergeant Kennelly failed to intervene to stop officers from using excessive force and that Kennelly was not entitled to qualified immunity. *Id.* at 901-02.

Back in the district court, after engaging in discovery, Defendants moved for summary judgment, R.Doc. 94; R.Doc. 106, which Plaintiffs opposed, App. 27, R.Doc. 111.

The district court granted Defendants' motions. App.1117, R. Doc. 134. Although the district court noted the standard of review on summary

judgment, *see* App.1126, R.Doc. 134, at 10, in its recitation of the facts, the district court drew heavily from Defendants' versions of the facts in dispute, *see generally* App.1118-24, R.Doc. 134, at 2-8 (relying largely on exhibits filed by Defendants). This error is reflected in the district court's analysis of the merits of the Fourth Amendment claim under each of the *Graham* factors.[7]

First, as to the severity of the crime, the district court concluded that, as a matter of law, Mr. Mitchell "was clearly engaged in a multitude of serious felony crimes." App.1132-33, R.Doc. 134, at 16-17. But the host of "felonious conduct" to which the court refers was described by defendants as applying to "many protesters," generally, not to Mr. Mitchell specifically. R.Doc. 106, at 36. And, in fact, Mr. Mitchell was only actually charged with criminal trespass, N.D. Cent. Code § 12-1-22-03, and "physical obstruction of a governmental function," N.D. Cent. Code § 12.1-08-01, both Class A misdemeanors. Second Amended Criminal Complaint, *State v. Mitchell*, No. 30-2017-CR-96 (Morton Cnty. Feb. 10, 2017).

---

[7] The district court also dismissed Mr. Mitchell's claims against the John Doe Defendants. App.1130-31, R.Doc. 134, at 14-15. Mr. Mitchell is not pursuing these claims on appeal.

Second, the district court held that it was reasonable for Piehl and Welk to believe Mr. Mitchell posed a threat to their own and their fellow officers' safety. App.1133-34, R.Doc. 134, at 17-18. Again, however, the majority of the facts the district court relied on to support this conclusion have nothing to do with Mr. Mitchell, *id.* ("protestors" threw various items at law enforcement and made verbal threats), and have no bearing on whether a reasonable officer would perceive that Mr. Mitchell posed an immediate threat at the time the less-lethal force was deployed, App.1134, R.Doc. 134, at 18 ("Mitchell was seen cutting concertina wire" two days prior).

As to actively resisting or fleeing arrest, the district court concluded that it was reasonable for officers to use more than *de minimis* force because they reasonably believed Mr. Mitchell would flee, characterizing him as having "fled" numerous times. App.1134-35, R.Doc. 134, at 18-19. This is despite the fact that Piehl and Welk admitted that Mr. Mitchell was "not fleeing or resisting arrest" at the time they shot him. App.937, R.Doc. 111-17, at 47 (177:4-178:8); App.531, R.Doc. 111-5, at 72 (279:25-280:20); *see also* App.1134, R.Doc. 134, at 18 (noting that Mr. Mitchell "was not running away when law enforcement fired"), and that Mr.

Mitchell explained that he was not "fleeing," but rather trying to keep himself out of harm's way, App.318-19, R.Doc. 111-4, at 234-35 (233:12-234:6).

The district court also concluded that two "other relevant circumstances" meant that Defendants were entitled to summary judgment on the merits of Mr. Mitchell's excessive force claim. App.1136, R.Doc. 134, at 20. First, the district court concluded that Mr. Mitchell "failed to present any evidence to show Officer Welk's and Deputy Piehl's conduct was anything more than negligence or gross negligence," because both Defendants "testified they were aiming at Mitchell's lower extremities" and Mr. "Mitchell failed to provide any evidence that either officer intended to cause Mitchell harm." App.1137, R.Doc. 134, at 21. Second, with regard to Piehl, the court concluded that Mr. "Mitchell is unable to prove, beyond speculation, whether Deputy Piehl's round is the one that struck Mitchell's eye," and has failed to "provide some sort of evidence to survive a summary judgment motion." *Id*. One page earlier, however, the district court appeared to recognize that material disputes of fact existed regarding where Piehl's shot went, and in such

circumstances "the facts must be construed in favor of Mitchell." App.1136, R.Doc. 134, at 20 & n.11.

After holding that Defendants were entitled to summary judgment on the merits of Mr. Mitchell's excessive force claim, the district court nevertheless went on to conclude that "[e]ven if the officers['] use of force was objectively unreasonable, it was not clearly established at the time that such conduct violated Mitchell's rights." App.1138, R.Doc. 134, at 22. Rather, the court held that it was clearly established that law enforcement could use less-than-lethal force or munitions to effect the arrest of an individual, prevent their flight, and to disperse a crowd to restore law and order to a scene. App.1139-40, R.Doc. 134, at 23-24.

Finally, the court dismissed Mr. Mitchell's *Monell* and failure-to-intervene claims because, as the court saw it, the individual officers did not engage in excessive force, and therefore the remaining claims would "necessarily fail." App.1141, R.Doc. 134, at 25. This appeal followed.

## SUMMARY OF ARGUMENT

The district court erred in concluding that no genuine issues of material fact exist as to Mr. Mitchell's excessive force claim. Throughout the court's analysis of the *Graham* factors, it took Defendants' version of

the events in question, contrary to the appropriate summary judgment standard. This cardinal error was compounded by additional legal errors along the way.

A jury could conclude that a reasonable officer would not think that Mr. Mitchell was engaged in "serious crimes." Mr. Mitchell was charged only with obstruction of a government function and criminal trespass, which this Court has described as "both nonviolent misdemeanors." *Mitchell I*, 28 F.4th at 898. And the district court's conclusion to the contrary was based on testimony about protestors in general, rather than Mr. Mitchell in particular.

A jury could also conclude that a reasonable officer would not think Mr. Mitchell posed an immediate threat to officer safety at the moment he was shot. Critically, both Piehl and Welk admitted that at the time they fired the less-lethal rounds, Mr. Mitchell was not posing a threat. The video confirms as much. In its conclusion to the contrary the district court again discussed "protestors'" conduct, although that has no bearing on *Mr. Mitchell*'s threat level. What evidence the district court does cite that directly relates to Mr. Mitchell is scant—for example, he was seen cutting concertina wire *two days* before he was shot. And the district

court erroneously ascribed a threat to Mr. Mitchell's protected speech: saying an obscenity to the police.

A jury could likewise conclude a reasonable officer would not think Mr. Mitchell was actively resisting arrest or attempting to flee when he was shot. Both Piehl and Welk testified as much at their depositions, and the video shows Mr. Mitchell standing still when he was shot. The district court placed much emphasis of Mr. Mitchell's retreat from the barricade, but a jury could easily conclude that Mr. Mitchell did so to keep himself safe—as he testified—and not to flee.

A jury could also conclude that the force used here was excessive based on the severity of Mr. Mitchell's injury—the shattering of his orbital wall. And the district court's "other relevant circumstances" analysis was erroneous, and should not prevent Mr. Mitchell's claim from being heard by a jury.

The district court also erred in granting qualified immunity to Piehl and Welk, because it used the same incorrectly-construed facts in the clearly-established inquiry. Under a proper reading of the facts, the Defendants are not entitled to qualified immunity, as this Court already held in *Mitchell I.*

Finally, the district court erred in granting summary judgment on Mr. Mitchell's claims against Sergeant Kennelly, Sheriff Kirchmeier, and Morton County, on the grounds that he had failed to make out a triable issue on his excessive force claim.

In all, this Court should reverse.

## ARGUMENT

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment. *Montoya v. City of Flandreau*, 669 F.3d 867, 870 (8th Cir. 2012). In doing so, it views "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Id.* Summary judgment is only proper if "no genuine issues of material fact exist and the nonmovant is entitled to judgment as a matter of law." *Id.*

## I. The district court erred in concluding no genuine issues of material fact exist on Mr. Mitchell's excessive force claim, because it viewed the evidence in the light most favorable to Defendants.

### A. The legal framework.

The fundamental error that infected the whole of the district court's analysis was that it failed to properly follow the summary judgment

standard in its review of whether a jury could find that Defendants violated Mr. Mitchell's Fourth Amendment rights.

The Fourth Amendment's "objective reasonableness" standard governs Mr. Mitchell's claim that Piehl and Welk employed excessive force. *See Westwater v. Church*, 60 F.4th 1124, 1128 (8th Cir. 2023). Determining whether the force used "is 'reasonable' requires balancing of the individual's Fourth Amendment interests against the relevant governmental interests." *Id.* (quoting *Cnty. of L.A. v. Mendez*, 581 U.S. 420, 427 (2017)) (cleaned up). The inquiry is based on the totality of the circumstances and focuses on the three factors set out by the Supreme Court in *Graham v. Connor*, which are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

"[W]hen the issue of unreasonable force is raised in a motion for summary judgment, a court must construe the facts in favor of . . . the non-moving party." *Id.* This means that the court is required to "view material disputed facts in a light most favorable to the non-moving

party," as long as those facts are not "blatantly contradicted" by the record. *Id.* at 1129 (cleaned up). At summary judgment, "courts should neither weigh evidence nor make credibility determinations." *Bell v. Kansas City Police Dep't*, 635 F.3d 346, 347 (8th Cir. 2011) (citing *Nyari v. Napolitano*, 562 F.3d 916, 922 (8th Cir. 2009)). "Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir. 2013) (cleaned up), *abrogated on other grounds by Nieves v. Bartlett*, 587 U.S. 391 (2019). But "[w]here the record does not conclusively establish the lawfulness of an officer's use of force," summary judgment "is inappropriate." *Marks v. Bauer*, 107 F.4th 840, 846-47 (8th Cir. 2024).

Although the district court's order acknowledged this framework, *see* App.1126-27, R.Doc. 134, at 10-11, it failed to apply it. This error infected the district court's analysis of each of the three *Graham* factors. The district court concluded that Mr. "Mitchell was engaged in serious crimes, threatened law enforcement, and posed a risk of flight." App.1140, R.Doc. 134, at 24. Each of these conclusions was based on an

erroneous reading of the record, contrary to the summary judgment standard.

**B.    A jury could conclude that a reasonable officer would not think Mr. Mitchell was engaged in "serious crimes."**

A jury could conclude Mr. Mitchell was only engaged in minor crimes—which would not justify the use of more-than-*de-minimis* force—when Defendants shot him. To start, Mr. Mitchell's testimony confirmed he was a peaceable member of a group of largely peaceful protestors. *See* App.197, R.Doc. 111-4, at 113 (112:3-5) ("I held my Navajo Nation flag on the hill standing there in peaceful prayerful . . . protest."); App.308, R.Doc. 111-4, at 224 (223:22-24) (putting up teepee poles because "[w]e were in peaceful prayer"); App.365, R.Doc. 111-4, at 281 (280:18-22) ("As far as we kn[e]w, we were in agreement with law enforcement to where we can peaceful[ly] protest and not cross the barricade."). That testimony is consistent with the video footage from the night in question. *See generally* App.699, R.Doc. 111-12 (video); App.19, R.Doc. 95-2 (Defendants' "Index of Events" to video).

Testimony from numerous officers at the protest, including Defendants, supports the same conclusion. Sergeant Kennelly stated that he did not "witness Mr. Mitchell do anything that evening that would

. . .qualify him as an agitator," meaning "[o]ne that is instigating violence," App.619, 630, R.Doc. 111-7, at 21, 32 (75:23-76:8, 117:5-8), and notably did identify *other* protestors as "agitators," App.621, R.Doc. 111-7, at 23 (82:6-24).[8] Deputy Chief Stugelmeyer opined that Mr. Mitchell was "potentially" a leader of the protest because "he's up there engaging and listening," but described him as "more of a listener to what was being said back and forth." App.746, R.Doc. 111-13, at 47 (178:13-17); *see also* App.699, R.Doc. 111-12 (9:10-16:04, 16:20-18:55).

The shooting officers themselves testified that they had no information about Mr. Mitchell's prior conduct that could have justified the use of force. Piehl testified that he was simply told "that person needs to be arrested"—he was not told why. App.916, R.Doc. 111-17, at 26

---

[8] Officers had different definitions of what would qualify someone as an "agitator." *Compare* App.619, R.Doc. 111-7, at 21 (76:3-18) (Kennelly testifying an agitator is someone "instigating violence . . . to promote . . . injury") *with* App.915-16, R.Doc. 111-17, at 25-26 (92:22-93:4) (Piehl testifying an agitator is someone "who gets the rest of the protesters motivated"). The label of "agitator" is immaterial. App.1131-32, R.Doc. 134, at 15-16 ("Regardless of Mitchell's label, it is his conduct . . . that will determine if summary judgment is warranted."). But any factual disputes about whether Mr. Mitchell's *conduct* would qualify him as an "agitator" bear on whether he was committing the more serious crimes that the Defendants (and the district court) would ascribe to him. *See infra* at 29-34.

(94:11-22). He also confirmed that he never observed Mr. Mitchell engaging in any violent or threatening behavior, or throw anything at a law enforcement officer. App.921, 923-24, R.Doc. 111-17, at 31, 33-34 (115:23-116:5, 124:25-125:5). Crucially, when asked what laws he perceived Mr. Mitchell to be violating, Piehl answered "trespassing" and "disobedience of a lawful order." App.924, R.Doc. 111-17, at 34 (126:1-10). Welk similarly testified that before using force against Mr. Mitchell, Welk had not witnessed him engage in any acts of violence towards law enforcement or property destruction. App.531, R.Doc. 111-5, at 72 (279:25-280:20). In short, a jury could find that at the time he was shot Mr. Mitchell was a peaceful protestor in a largely peaceful protest, suspected of no more than minor misdemeanor crimes. *See Mitchell I*, 28 F.4th at 898 (describing "trespassing and obstructing a government function" as "both nonviolent misdemeanors").

The district court, however, concluded that Mr. Mitchell "was clearly engaged in a multitude of serious felony crimes." App.1133, R.Doc. 134, at 17; *see also* App.1132, R.Doc. 134, at 16 ("Mitchell was engaged in numerous illegal actions, some of which constituted felonious conduct."). It then went on to provide a laundry list of North Dakota crimes Mr.

Mitchell allegedly violated, including offenses such as aggravated assault on peace officers, arming rioters, and felony terrorism, App.1132-33, R.Doc. 134, at 16-17 (citing to and drawing directly from the Defendants' motion for summary judgment, R.Doc. 94, at 44-47). To reach this conclusion, the district read the facts in a light most favorable to Defendants; indeed, it appears to have largely imported Defendants' assertions as to Mr. Mitchell's alleged crimes into its order. This was error.

To start, although the district court has a ten-crimes-long list of violations it would pin on Mr. Mitchell, for only two does it provide uncontested facts to support its conclusion. *See* App.1132-33, R.Doc. 134, at 16-17. Specifically, the district court provides support for a destruction of property violation by noting that Mr. Mitchell admitted to cutting concertina wire, App.1133, R.Doc. 134, at 17; *see* App.235, R.Doc. 111-4, at 151 (150:21-24) (admits to cutting wire and bringing it to camp, but says he "didn't give [it]] to anybody"), and an obstruction of a government function violation by noting Mr. Mitchell held a shield, App.1133, R.Doc. 134, at 17; App.326, R.Doc. 111-4, at 242 (241:6-9) (admits to holding a shield). But these are misdemeanor crimes. *See* N.D. Cent. Code § 12.1-

21-05 ("Criminal Mischief") (a class B misdemeanor, unless accompanied by aggravating factors); N.D. Cent. Code § 12.1-08-01 ("Physical Obstruction of a Government Function") (a class A misdemeanor); *see also* N.D. Cent. Code § 24-03-05 ("Closing of Roads") (also cited by district court; a class A misdemeanor). So the undisputed facts in no way support the district court's "severe crimes" conclusion.[9]

In contrast with the undisputed evidence, which points to only minor misdemeanor violations, the bulk of the evidence the district court cited to support its conclusion as to the severity of the crimes is blanket testimony about the protestors *in general*, unconnected to Mr. Mitchell in particular. *See* App.1133, R.Doc. 134, at 17 (citing R.Doc. 95-5, at 82:15-22 (Steele stating that "[w]e were threatened by these protestors nightly"); R.Doc. 95-7, at 26 (103:5-25) (Kennelly stating that "[a]nyone on the bridge" had been "informed that they were now in commission of several offenses to include felony-level rioting, trespassing, simple assault, [and] aggravated assault on peace officers"); R.Doc. 99-1 at 2

---

[9] What is more, neither Piehl nor Welk was even aware that Mr. Mitchell had cut concertina wire two days before, *see* App.513, R.Doc. 111-5, at 54 (206:3-207:1); App.916, 922, R.Doc. 111-17, at 26, 32 (94:5-20, 120:13-24), so it is irrelevant to the *Graham* analysis.

(Kennelly's case report, stating he told protestors "they were trespassing and engaging in a riot")).

But this Court's caselaw demonstrates that the "crimes" inquiry for purposes of assessing the reasonableness of a use of force needs to be individualized to the person against whom the force is deployed. *See, e.g., Nieters v. Holtan*, 83 F.4th 1099, 1108 (8th Cir. 2023) (noting crime of arrest was "failure to disperse—a misdemeanor," despite defendant's "focus[] on the fact there had been 'hours of criminal activity occurring'"); *Baude v. Leyshock*, 23 F.4th 1065, 1073 (8th Cir. 2022) (noting plaintiff was "a compliant individual among a generally peaceful and compliant crowd"). And, as detailed above, the bulk of the testimony relating to Mr. Mitchell in particular points in the opposite direction of the district court's conclusion. *See supra* at 26-29.

In addition to vague and undifferentiated statements about "protestors," the district court pointed to two officer affidavits in the record relating to Mr. Mitchell's arrest to support its conclusion as to the alleged seriousness of Mr. Mitchell's crimes. App.1133, R.Doc. 134, at 17 (citing App.23, R.Doc. 95-16; App.25, R.Doc. 95-17). The affidavit written by Officer Ellefson concludes there was probable cause to charge Mr.

Mitchell for physical obstruction of a government function and criminal trespass, both misdemeanors. App.23, R.Doc. 95-16, at 1. The affidavit provides a number of more serious crimes as options, but Ellefson did not check those boxes. *Id.* The two identified charges are the charges that the State of North Dakota brought against Mr. Mitchell. Pretrial Diversion Agreement, *State v. Mitchell*, No. 30-2017-CR-96 (Morton Cnty. Nov. 5, 2018). Both charges were dismissed pursuant to a pretrial diversion agreement. *Id.* In *Mitchell I*, this Court described those charges as "both nonviolent misdemeanors." 28 F.4th at 898.

The second affidavit of arrest, by Officer Peltier, opines that there was probable cause to charge Mr. Mitchell with disorderly conduct and inciting a riot, in addition to criminal trespass (but not obstruction of a government function). App.25, R.Doc. 95-17, at 1. The narrative portion of this affidavit is spare, the only facts asserted are that "Markus Mitchell was participating in riot activities"—with no details as to what he is alleged to have done—"and trespassing on the Backwater Bridge." App.26, R.Doc. 95-17, at 2. And, notwithstanding the officer's affidavit,

Mr. Mitchell was not charged with disorderly conduct, or inciting or engaging in a riot.[10]

In sum, looking at the evidence as a whole and viewing the facts in the light most favorable to Mr. Mitchell reveals that a reasonable jury could conclude just the opposite as the district court—that Mr. Mitchell was not engaged in any serious crimes that would justify the use of more-than-*de-minimis* force.

As this Court recognized in *Mitchell I*, 28 F.4th at 898, in case after case, this Court has held that crimes such as these do not support a more-than-*de-minimis* use of force. *See, e.g.*, *Small*, 708 F.3d at 1003-04, 1005-

---

[10] Even if the protest that evening could conceivably be characterized as a riot, which it was not, Mr. Mitchell could not have been charged with either inciting or participating in a riot. *See* N.D. Cent. Code § 12.1-25-01, N.D. Cent. Code § 12.1-25-03; *State v. Bearrunner*, 912 N.W.2d 894, 897-98 (N.D. 2019). Officer testimony made clear that Mr. Mitchell did not "incite," "urge," or "give[] commands, instructions, or directions" to any protester, *see, e.g.*, App.630, R.Doc. 111-7, at 32 (117:5-8) (Kennelly testifying Mr. Mitchell did not "do anything that evening that would . . . qualify him as an agitator"); App.746, R.Doc. 111-13, at 47 (178:15-17) (Stugelmeyer testifying Mr. Mitchell was just "a listener to what was being said" during negotiations). And no officer testified that Mr. Mitchell engaged in any violent conduct. *See* N.D. Cent. Code § 12.1-25-03; *see also* App.531, R.Doc. 111-5, at 72 (279:25-280:20) (Welk testifying he did not see Mr. Mitchell "engag[e] in acts of violence"); App.921, R.Doc. 111-17, at 31 (115:23-116:5) (Piehl testifying same). Notably, North Dakota law is clear that "[m]ere presence at a riot is not an offense." N.D. Cent. Code § 12.1-25-03.

06 (affirming denial of summary judgment on excessive force claim relating to officer "running and tackling [plaintiff] from behind," where plaintiff "was charged with nonviolent misdemeanors" of disorderly conduct, failing to disperse, unlawful assembly, and interference with official acts); *Montoya*, 669 F.3d at 871 (reversing grant of summary judgment on excessive force claim for "leg sweep" where, "[a]t most, [plaintiff's] actions amounted to a violation of a law restricting disorderly conduct, a misdemeanor"); *Johnson v. Carroll*, 658 F.3d 819, 827 (8th Cir. 2011) (same, for claim based on macing, where plaintiff's "attempts to interfere with [her nephew's] arrest did not amount to a severe or violent offense, as demonstrated by her arrest on a charge of obstructing legal process, a misdemeanor"); *Rokusek v. Jansen*, 899 F.3d 544, 547 (8th Cir. 2018) (affirming denial of summary judgment on excessive force claim, because a "double-chicken-wing hold" was not objectively reasonable on "nonviolent offender" arrested for driving while impaired); *Tatum v. Robinson*, 858 F.3d 544, 548-59 (8th Cir. 2017) (same, where officer deployed pepper spray on man suspected of shoplifting); *Bauer v. Norris*, 713 F.2d 408, 412-13 (8th Cir. 1983) (affirming district court's rejection of defendants' post-trial motions after jury verdict for plaintiffs on

"relatively minor" use of force, concluding it was "relevant . . . that the crime for which [plaintiffs] were eventually arrested, disorderly conduct, was a class two misdemeanor under South Dakota law").

In short, the district court erred in concluding that this first *Graham* factor weighs in Defendants' favor, based on a legally improper reading of the record.

### C. A jury could conclude that a reasonable officer would not think Mr. Mitchell posed an immediate threat to officer safety at the moment he was shot.

The second prong of the *Graham* test relates to "whether the suspect poses an immediate threat to the safety of the officer or others." *Graham*, 490 U.S. at 396. The district court concluded that "it was reasonable for Officer Welk and Deputy Piehl to believe Mitchell posed a threat to their own and their fellow officers' safety." App.1133, R.Doc. 134, at 17. But the district court again failed to take the facts in a light most favorable to Mr. Mitchell, and made additional legal errors along the way to this conclusion.

A jury could find that a reasonable officer would not have believed Mr. Mitchell posed a threat to officers at the time the less-lethal force was deployed. *See Marks*, 107 F.4th at 847 ("[I]t is important to note that

we assess the reasonableness of the response to the threat by looking primarily at the threat present at the time an officer deploys the force."). Critically, both Piehl and Welk admitted that at the time they fired the less-lethal rounds, Mr. Mitchell was not posing a threat. App.937, R.Doc. 111-17, at 47 (177:4-13); App.531, R.Doc. 111-5, at 72 (279:25-280:20). Welk admitted that there was no justification for shooting Mr. Mitchell, beyond the fact that he was told by his commanding officer to do so, and that they were trying to effectuate an arrest. App.465, R.Doc. 111-5, at 64 (247:1-12). Indeed, Welk testified more broadly that prior to using the less-lethal force against Mr. Mitchell, Welk never personally observed him engaging in any types of violence, property destruction, or issuing any threats. App.531, R.Doc. 111-5, at 72 (279:25-280:20). Not only did Welk testify that *Mr. Mitchell* was not a threat either at the moment of the use of force or at all that evening, he admitted that the protesters more generally were not threatening officers or targeting officers with violence. App.527, R.Doc. 111-5, at 68 (263:1-20).

Piehl testified to the same effect. He acknowledged that at the time of the shooting, Mr. Mitchell was not engaging in any acts of violence or threatening anyone. App.937, R.Doc. 111-17, at 47 (177:4-13). Piehl

estimated he was 54 to 60 feet away from Mr. Mitchell at the time he fired, App.921, R.Doc. 111-17, at 31 (113:11-13)—so close enough to observe his actions, but not close enough that the unarmed Mr. Mitchell posed a threat. More generally, Piehl testified that he *never* personally observed Mr. Mitchell engaging in violent activity or threatening behavior. App.923-24, R.Doc. 111-17, at 33-34 (124:25-125:5). In short, the two shooting officers did not identify Mr. Mitchell as a threat— they shot him only because they were told to target him. App.523, R.Doc. 111-5, at 64 (247:1-12); App.922, R.Doc. 111-17, at 32 (117:16-118:10).

The video recording is consistent with the Defendants' testimony; it shows nothing that would indicate Mr. Mitchell posed a serious threat. *See generally* App.699, R.Doc. 111-12. Indeed, Defendants' "index" to the video ascribes no violence or threats to Mr. Mitchell *at all*, let alone at the time the less-lethal shots were fired. *See* App.19, R.Doc. 95-2.

In the face of all this testimony, from which a jury could conclude that Mr. Mitchell did not pose a serious threat to officer safety at the time the shots were fired, the district court found to the contrary. App.1133, R.Doc. 134, at 17. But as with the district court's review of the "crimes"

prong, it erred by viewing only Defendants' version of the facts, which do not even support the conclusion the district court reached.

To start, the district court noted that "protestors" had thrown various objects at officers during the course of the protests. App.1133, R.Doc. 134, at 17. But the district court does not say that *Mr. Mitchell* did any of these things—nor could it, because the evidence the court cited to would not support it. *See* R.Doc. 106-23, at 154 (154:3-11) ("protestors throwing ice chunks and snowballs"); App.515, R.Doc. 111-5, at 56 (214:15-21) ("ice chunks and frozen water bottles" "were being thrown at law enforcement"); App.849, R.Doc. 111-16, at 16 (54:10-15) ("people" were "throwing stuff" back in October and November); App.854, R.Doc. 111-16, at 21 (74:24-75:11) ("protestors . . . were throwing" things); App.912, R.Doc. 111-17, at 22 (78:2-11) (an "individual . . . threw [a] shield" at officers); App.1053, R.Doc. 111-43 at 23 (84:1-6) (noting he had been hit in the helmet with a large bolt on a different date). So too with the district court's statement that "[p]rotestors"—not Mr. Mitchell—"had threatened law enforcement." App.1134, R.Doc. 134, at 18 (citing App.856, R.Doc. 111-16, at 23 (82:14-22) ("We were threatened by these protestors nightly."); and App.695, R.Doc. 111-8, at 0:00-1:30 (protesters

at a different location yelling obscenities and throwing snowballs)). The district court erred in considering the actions of unnamed members of the protest across a multi-month period when assessing the threat that Mr. Mitchell posed at the moment Defendants shot him. *See Nieters*, 83 F.4th at 1108-09 (noting that although defendant "focuses on the fact that there had been 'hours of criminal activity occurring' and that he was 'under constant threat of harm from active rioters,' he cannot point to any facts suggesting an immediate threat to his safety or the safety of others").

The evidence the district court cites that *does* involve Mr. Mitchell directly is scant, and none supports the district court's conclusion that "it was reasonable for Officer Welk and Deputy Piehl to believe Mitchell posed a threat to their own safety and their fellow officer's safety." App.1133, R.Doc. 134, at 17.

*First*, the district court noted that Mr. "Mitchell was seen cutting concertina wire." App.1134, R.Doc. 134, at 18. True enough, but a jury could conclude that a reasonable officer would not think that cutting some wire makes a person a threat to officers. *See Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (This is "hardly the description of an officer in fear of being physically attacked."). What's more, this

Court has emphasized that the "threat" inquiry is focused on the moment the force is deployed. *See Marks*, 107 F.4th at 847 ("[I]t is important to note that we assess the reasonableness of the response to the threat by looking primarily at the threat present at the time an officer deploys the force."). And it's not clear how Mr. Mitchell cutting concertina wire two days prior made him a *present threat* to the officers when they shot him. *See* App.234, R.Doc. 111-4, at 150 (149:21-24) (Mr. Mitchell testifying he cut concertina wire on January 16). This Court has been clear that a vague risk of future harm is insufficient to justify more-than-*de-minimis* force—the threat needs to be immediate. *See, e.g.*, *Brown*, 574 F.3d at 497 (plaintiff posed "at most a minimal safety threat" where there were two glass tumblers at plaintiff's feet but "[s]he did not reach for them"); *Tatum*, 858 F.3d at 548-59 (Although "a reasonable officer might have thought [plaintiff's] angry arguing could eventually escalate to physical violence . . . a reasonable officer would not think [plaintiff] . . . posed an 'immediate' safety threat.").

*Second*, the district court observed that Sergeant Steele believed he saw Mr. Mitchell starting fires with tires along the eastern flank of the bridge at some unspecified time. App.1134, R.Doc. 134, at 18 (citing

App.851, R.Doc. 111-16, at 18 (62:8-9)). But Mr. Mitchell testified that although he saw a fire on the eastern flank, he had nothing to do with it. *See* App.314-15, R.Doc. 111-4, at 230-31 (229:18-230:3). So this fact is disputed, and the district court was wrong to credit the Defendants' version. *See, e.g.*, *Westwater*, 60 F.4th at 1128 ("When the issue of unreasonable force is raised in a motion for summary judgment, a court must construe the facts in favor of . . . the non-moving party," meaning "when opposing parties tell two different stories, the court must view material disputed facts in a light most favorable to the non-moving party" (cleaned up)). At any rate, even if Mr. Mitchell *had* been involved, a jury could also conclude that a reasonable officer would not perceive such a fire to pose an immediate threat to law enforcement. *See id.* at 1129 (reversing grant of summary judgment because "a reasonable fact-finder could find [plaintiff's version of the incident] credible after trial"); *cf.* App.315, R.Doc. 111-4, at 231 (230:8-13) (Mr. Mitchell testifying fire on the bridge was "[t]o keep individuals warm" on a "negative 20-plus degrees" night).

*Third*, the district court noted that Mr. Mitchell "was seen at various times equipped with a shield and a gas mask" and "admit[ted] he

was part of the shield wall to prevent law enforcement from going to their camp." App.1134, R.Doc. 134, at 18. But a jury could conclude a reasonable officer would perceive this behavior as *defensive*, rather than threatening. *Cf. Nieters*, 83 F.4th at 1109 ("[A] jury could conclude a reasonable officer would have interpreted [plaintiff's] actions in turning his body as an attempt to shield himself."); App.265, 361-62, R.Doc. 111-4, at 181, 277-78 (180:9-12; 276:19-277:5) (Mr. Mitchell testifying protesters held "shields to protect themselves" and "to protect the . . . women and elders that were on the bridge peacefully praying"); App.287-88, R.Doc. 111-4, at 203-04 (202:22-203:17) (Mr. Mitchell noting medics at the protest camp had gas masks because officers shot CS gas canisters at protesters). At any rate, this conduct falls far short of the "*immediate threat*" that this Court has required for this prong of the *Graham* test. *See, e.g.*, *Marks*, 107 F.4th at 848 ("On this record, a reasonable jury could find that *at the time [plaintiff] was shot*, he did not pose an *immediate* threat to [defendant] or anyone else at the scene." (emphasis added)).

*Fourth*, the district court considered Mr. Mitchell's speech, noting that he "taunt[ed] law enforcement" and "escalated the situation" at one point during negotiations "by telling officers '[f]uck you.'" App.1134,

R.Doc. 134, at 18. But this Court's caselaw for the past fifty years has been clear: "The use of any force by officers simply because a suspect is argumentative, contentious, or vituperative is not to be condoned." *Bauer*, 713 F.2d at 412 (quoting *Agee v. Hickman*, 490 F.2d 210, 212 (8th Cir. 1974)) (cleaned up). In *Bauer*, for example, this Court upheld a jury verdict in plaintiffs' favor, concluding that the "epithets and obscenities" a plaintiff lobbed at the officer was insufficient to excuse even the "relatively minor" force employed because "verbal abuse alone does not justify the use of any force." *Id.* at 410, 413. Likewise, in *Shannon v. Koehler*, 616 F.3d 855 (8th Cir. 2010), this Court held that the "disrespectful, even churlish manner" with which the plaintiff addressed the officer, including with profanity, "did not make [the officer's] use of force acceptable under extant law." *Id.* at 865. And there's good reason for this precedent—such "criticism of officers, even with profanity, is protected speech." *Molina v. City of St. Louis*, 59 F.4th 334, 343 (8th Cir. 2023) (cleaned up).

*Finally*, the district court concluded that, "[l]aw enforcement believed Mitchell had committed a series of serious felony crimes." App.1134, R.Doc. 134, at 18. This argument fails for the reasons

explained above. *See supra* Part I.B. And this Court has routinely sent excessive force cases to trial where material disputes existed as to the reasonableness of the force, and where plaintiffs were suspected of crimes of similar severity levels to Mr. Mitchell's (trespassing and obstruction of a government function). *See supra* at 34-35 (collecting cases).

In short, contrary to the district court's view, a jury could conclude that a reasonable officer on the scene would not have perceived that Mr. Mitchell posed an immediate threat to their safety. Indeed, the two officers who shot him did not. *See supra* at 36-38. That should be the end of the inquiry.

### D. A jury could conclude a reasonable officer would not think Mr. Mitchell was actively resisting arrest or attempting to evade arrest by flight.

When Piehl and Welk shot Mr. Mitchell, he was not fleeing or otherwise actively attempting to evade arrest. Both defendants testified as much at their depositions. *See* App.937, R.Doc. 111-17, at 47 (177:11-13) (answering "no" to "he wasn't running away at this moment, was he?"); App.523, R.Doc. 111-5, at 64 (247:1-12) (Mr. Mitchell's presence on the bridge, Welk's instructions to fire, and that he was attempting to effectuate an arrest were the only justifications for shooting). And the

video shows Mr. Mitchell standing still when he was shot. App.699, R.Doc. 111-12, at 1:20:03-1:20:40.

The district court, however, erroneously concluded that the undisputed facts demonstrated unequivocally that Mr. Mitchell was both fleeing and actively resisting such that Piehl and Welk were justified in using less-lethal force against him. But the evidence doesn't add up.

*First*, the district court concluded that Mr. "Mitchell admitted to fleeing from officers anytime they would conduct a push on the protestors." App.1134, R.Doc. 134, at 18. Mr. Mitchell did admit to being "out of range" of the officers during the push. App.316, 318, R.Doc. 111-4, at 232, 234 (231:9-23; 233:12-33). But in testimony *just after* that exchange cited by the district court, when asked whether he was keeping ahead of officers "so they wouldn't arrest [him]," Mr. Mitchell said "no"— he was keeping himself "in a safe position" and "was trying to stay out of firing range or out of exposure of the gas." App.318-19, R.Doc. 111-4, at 234-35 (233:20-234:6). "Taking this fact in the light most favorable to [Mr. Mitchell], a jury could conclude a reasonable officer would have

interpreted [Mr. Mitchell's] action . . . as an attempt to [protect] himself . . . rather than an attempt to flee." *Nieters*, 83 F.4th at 1109.[11]

*Second*, the district court observed that Mr. "Mitchell is seen on video holding a shield in open defiance of law enforcement commands to disperse, constituting active physical resistance." App.1134-35, R.Doc. 134, at 18-19. But since there are material disputed facts regarding whether Mr. Mitchell was told he was under arrest, App.626, R.Doc. 111-7, at 28 (103:5-12); App.924-25, R.Doc. 111-17, at 34-35 (128:17-129:3); App.524, R.Doc. 111-5, at 65 (251:11-23), he could not—as a matter of law—be *resisting* arrest, *see Small*, 708 F.3d at 1005 ("He was not in flight or resisting arrest. [The officer] had not advised him he was under arrest."); *Poemoceah v. Morton Cnty.*, 117 F.4th 1049, 1053 (8th Cir. 2024) ("He was not told he was under arrest nor was he told to stop.").

---

[11] The same is true for the video evidence. The district erroneously characterized the videos as "show[ing] Mitchell fleeing from law enforcement." App.1136, R.Doc. 134, at 20. But at the time of the first push, Mr. Mitchell wasn't even anywhere near the officers or barricade, having walked south approximately twenty-five minutes prior. App.698, R.Doc. 111-11, at 20:30-21:30. And as for the second push, the video evidence, like Mr. Mitchell's deposition testimony, just demonstrates him moving south to avoid being "in firing range" or "expos[ed] [to] the gas." R.Doc. 106-15, at 27:27-28:00 (video provided to the court under separate cover).

Even if Mr. Mitchell *had* been told he was under arrest, however, this Court's caselaw is clear that much more than ignoring law enforcement commands is required to constitute "active physical resistance" such that less-lethal force is justified. Again and again, this Court has explained that mere "[n]oncompliance . . . do[es] not amount to active resistance." *Tatum*, 858 F.3d at 549; *see also Peterson v. Kopp*, 754 F.3d 594, 597, 600 (8th Cir. 2014) (concluding plaintiff was not resisting despite refusing orders to leave), *abrogated on other grounds by Nieves v. Bartlett*, 587 U.S. 391 (2019); *Brown*, 574 F.3d at 497 (concluding plaintiff who disobeyed officer commands to end 911 call was not actively resisting); *Rokusek*, 899 F.3d at 546-47 (characterizing plaintiff as "not actively resisting or fleeing" despite refusal to comply with officer's three requests to stand for handcuffing).[12] Notably, resisting arrest did not

---

[12] *Zubrod v. Hoch*, 907 F.3d 568 (8th Cir. 2018), which the district court cited, App.1135, R.Doc. 134, at 19, is not to the contrary. The quoted language—in a footnote—disposing of inapposite cases collected in an unpublished out-of-circuit opinion cannot be read to say anything about whether disobeying officers, on its own, can somehow constitute "active resistance." *Zubrod*, 907 F.3d at 578 n.5 (discussing *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495, 496 (6th Cir. 2012)). It is especially puzzling that the district court considered *Zubrod* to support its conclusion, since that case actually is a paradigmatic example of where *active, physical* noncompliance *does* support a use of force, in a "tense,

appear on the district court's long list of crimes Mr. Mitchell purportedly was comitting.

The cases on which the district court relied are not remotely on-point factually. App.1135, R.Doc. 134, at 19. To start, the district court's only two "flight" cases involved situations where officers reasonably believed they had a suspect who *had already fled previously* and was actually fleeing *at the moment of the force. See e.g. McKenney v. Harrison*, 635 F.3d 354, 357-58, 360 (8th Cir. 2011) (suspect, who fled from defendant officer in his vehicle earlier in the month, "suddenly lunged toward the window" to escape officers that were executing an arrest warrant in the suspect's home); *Boudoin v. Harsson*, 962 F.3d 1034, 1041 (8th Cir. 2020) (officer "knew multiple officers had attempted to stop a white male riding a black motorcycle . . . for speeding and that the suspect had evaded arrest multiple times by fleeing" and plaintiff matching that description pulled over for speeding on his motorcycle "did not

---

uncertain, and rapidly-evolving" situation. *Id.* at 578 (quoting *Graham*, 490 U.S. at 397). Specifically, the suspect's "confrontation with the police began" when an officer intervened in a situation that "could have ended with a woman's death," the suspect "continu[ed] his assault," and physically fought with three deputies "who were unable to obtain his compliance without the use of tasers." *Id.*

immediately pull to the shoulder of the highway," did not deploy his kickstand when stopped, and began shifting gears on the bike). And in the district court's remaining cases the subjects of force made some affirmative movement in contradiction to officer commands—and, it should be noted, the force deployed was substantially less serious than the force used by Defendants here. *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1009-10 (8th Cir. 2017) (holding "spin takedown" and taser use constitutional where defendant "instructed [plaintiff] twice to put his hands behind his back," but plaintiff "ignored him" and walked away); *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) (holding tasing constitutional where, after a takedown, "[i]t is undisputed that [plaintiff] refused to offer his hands when ordered to do so" and instead "reached for the couch in an effort to lift himself from the floor"); *Kelsay v. Ernst*, 933 F.3d 975, 980 (8th Cir. 2019) (holding law not clearly established preventing "takedown maneuver to arrest a suspect who ignored the deputy's instruction to 'get back here' and continued to walk away from the officer"). And in *Ehlers* and *Carpenter*, the arrestees were warned before being tased. *Ehlers*, 846 F.3d at 1008 (officer "warning [plaintiff]

that he was going to use the taser"); *Carpenter,* 686 F.3d at 650 (plaintiff "does not dispute that he was . . . warned about use of the taser").

In all, a jury could conclude a reasonable officer would not think Mr. Mitchell was actively resisting arrest or attempting to evade arrest by flight, and the district court's reasoning to the contrary was erroneous.

### E. A jury could conclude that the force used was excessive based on the severity of Mr. Mitchell's injury.

In addition to the three *Graham* factors, this Court also considers "the degree of injury . . . insofar as it tends to show the amount and type of force used." *McDaniel v. Neal*, 44 F.4th 1085, 1090 (8th Cir. 2022) (cleaned up). A jury could conclude this factor weighs strongly in Mr. Mitchell's favor. The extent of Mr. Mitchell's injuries are undisputed. "The bean bag round entered his eye socket, shattering the orbital wall of his eye and cheekbone, and ripping open his skin to near his left ear." App.1123, R.Doc. 134, at 7 n.8; *see also* App.699, R.Doc. 111-12 at 1:22:00-1:23:30. In *Mitchell I*, this Court noted that the "severity of Mitchell's injuries confirms what any reasonable officer in the defendants' position would have known: to fire a shotgun loaded with a lead-filled bean bag at a person . . . is to use more than *de minimis* force against the person." 28 F.4th at 898 (cleaned up); *see also Montoya*, 669 F.3d at 872 (rejecting

district court's characterization of plaintiff's broken leg as "unfortunate" and "unintended" consequence of reasonable force).

### F. The district court's "other relevant circumstances" analysis was erroneous, and does not prevent Mr. Mitchell's claim from being heard by a jury.

In addition to the errors the district court made in its assessment of each of the *Graham* factors, and its failure to consider the severity of Mr. Mitchell's injuries in its analysis of his excessive force claim, the district court concluded that "other relevant circumstances" weighed in favor of summary judgment in this case. *See* App.1136, R.Doc. 134, at 20. They do not.

*First*, the district court erred in suggesting that because neither officer (apparently) meant to shoot Mr. Mitchell *in the eye* (as opposed to his "lower extremities"), Mr. Mitchell's excessive force claim fails, and he has at most, proved they acted negligently. App.1137, R.Doc. 134, at 21; *see also id.* (opining "Mitchell failed to provide any evidence that either officer intended to cause Mitchell harm"). At the outset, this is incorrect for all of the reasons discussed above—a reasonable jury could find that the officers' use of less-than-lethal force *at all* was excessive, regardless of where they aimed, or where their shots landed. *See supra* Parts I.A-E.

Additionally, this is not how the excessive force inquiry works. A defendant need not have intended to cause the harm they did for an excessive force claim to proceed. The excessive force standard "is an objective one." *Graham*, 490 U.S. at 397. It asks "whether the officers' actions are 'objectively reasonable' . . . without regard to their underlying intent or motivation." *Id.*; *see also Marks*, 107 F.4th at 847 (holding an officer shooting the plaintiff with a chemical projectile under the circumstances was not objectively reasonable under the law, regardless of the officer's intent).

In *Mitchell I*, this Court already dismissed the notion that where Defendants were aiming has any bearing on the Fourth Amendment question in this case. The Court noted that the officers were not "aiming at Mitchell's face." 28 F.4th at 898. But they were aiming at him. *See id*. And, the Court held, "to fire a shotgun loaded with a lead-filled bean bag at a person, regardless of whether one is aiming at the person's face, is to use more than *de minimis* force against the person." *Id.* at 899.

*Second*, the district court also erred in concluding that Mr. Mitchell provided insufficient evidence to survive summary judgment in his excessive force case against Piehl, apparently on the theory that Mr.

Mitchell has not definitively proved that Piehl shot him. App.1136-37, R.Doc. 134, at 20-21. But Piehl admitted that he aimed and fired less-lethal "bean bag" rounds at Mr. Mitchell, App.921, R.Doc. 111-17, at 31 (113:7-23), who was standing still "almost straight in front of him," App.921, 936, R.Doc. 111-17 at 31, 46 (113:7-13; 176:1-6); that less-lethal munitions were "very accurate" from up to 75 feet and that he had a 100% accuracy rate in his less-lethal munition training, App.910, R.Doc. 111-17, at 20 (69:4-7; 71:7-10).[13] In fact, earlier in the protest, Piehl testified that he hit two other protesters, who were *not* standing still, with "bean bag" munitions. App.912, 926, R.Doc. 111-17, at 22, 36 (77:20-78:1-16; 133:22-134:9). And, of course, it is uncontested that Mr. Mitchell was shot and injured by these rounds. A jury could conclude that Piehl's shots hit where he aimed them—at Mr. Mitchell.

This is enough to get past summary judgment—a plaintiff need not prove a defendant's "personal participation" with certainty. This Court's

---

[13] Piehl was a good marksman more generally. He testified to completing marksmanship training "[e]very year, sometimes three or four times a year." App.910, R.Doc. 111-17, at 20 (69:21-23). Piehl has also served as a firearms instructor, App.897, R.Doc. 111-17, at 7 (19:21-23), and shot with an accuracy score of 100% in his most recent handgun evaluation, App.910, R.Doc. 111-17 at 20 (70:2-7).

decision in *White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017), resolves this issue. In *White*, the plaintiff claimed that in the course of arresting him unidentified officers held his head under water for three to five seconds, pepper sprayed him, and kicked and punched him while yelling racial slurs. *See id.* at 1080. The defendants argued on appeal that this Court "should affirm the grant of qualified immunity because [plaintiff] is unable to identify the defendants who performed these acts." *Id.* The Court rejected that argument—the very same one the district court relied on here. "Defendants are correct that '§ 1983 liability is personal,'" and to prevail, "a plaintiff must show each individual defendant's personal involvement in the alleged violation." *Id.* at 1080-81. But, the Court held, "[t]hat does not mean . . . that a § 1983 excessive force plaintiff must be able to personally identify his assailants to avoid summary judgment." *Id.* at 1081. There was testimony that connected four of the defendants "as officers who personally participated in [plaintiff's] arrest," and the Court concluded that the district court erred in granting qualified immunity to those defendants. *Id.* This was just another factual dispute that "it is 'the role of the jury' to resolve." *Id.* at 1080.

\* \* \*

As set out above, the district court erred in assessing each *Graham* factor because it consistently viewed the evidence in the light most favorable to Defendants. But when viewing that evidence correctly, it is clear that a jury could conclude that a reasonable officer would not think Mr. Mitchell was engaged in "serious crimes," was not posing an immediate threat to officers or others, and was not actively resisting or evading arrest by flight, and therefore the Defendants' firing of less-lethal rounds at him was excessive.

This Court has not shied away from reversing grants of summary judgment on excessive force claims when a district court fails to apply the proper and well-worn summary judgment standard. *See, e.g.*, *Westwater*, 60 F.4th at 1129-30 (reversing district court's grant of summary judgment on excessive force claim because "we may not simply credit [the defendant's] testimony at the summary judgment stage"); *Nieters*, 83 F.4th at 1108-09 (same, where a reasonable jury could conclude plaintiff turned away to shield himself from force, rather than attempting to flee); *Montoya*, 669 F.3d at 871 (same, where "[t]he district court appears to have credited [defendant's] account of the incident in concluding the force used against [plaintiff] was objectively reasonable under the

circumstances"); *Johnson*, 658 F.3d at 826-27 (same, where "[t]he district court appears to have credited the officers' characterization of the crowd and determined that the circumstances were 'tense, uncertain, and rapidly evolving,' thus justifying the officers' use of force against [plaintiff]").

## II. The district court erred in granting qualified immunity to Defendants Piehl and Welk on Mr. Mitchell's excessive force claim.

Officers are entitled to qualified immunity only if they do not have "fair warning" that their conduct was unconstitutional. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). When assessing the defendants' "actions" in question, courts must "view the evidence at summary judgment in the light most favorable to" the non-moving party. *Id.* at 657. As explained above, properly construing the material facts in dispute, Mr. Mitchell was not suspected of a serious crime, was not threatening anyone, and was neither fleeing nor resisting arrest. *See supra* Parts I.B-D. In other words, the facts in this case remain materially indistinguishable from those alleged in the complaint—the stage at which this Court last saw this case. When this Court reversed the district court's dismissal of Mr. Mitchell's excessive force claim, it observed that this Court has "held time

and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him." *Mitchell I*, 28 F.4th at 898 (collecting cases). For that reason, this Court explained, "[i]t is 'clearly established' that the use of more than *de minimis* force in circumstances like these violates the Fourth Amendment." *Id. Mitchell I* and the cases it cited is sufficient to decide this issue. Even more recently, in *Poemoceah*, this Court applied *Mitchell I*'s collection of cases to an excessive force claim that arose out of the same protests, and with similar facts, and held that when "drawing all inferences in [plaintiff's] favor," the "particularized right" as illustrated in *Mitchell I* "was clearly established in, and before, 2016." *See Poemoceah*, 117 F.4th at 1055.

The district court's conclusion to the contrary was error. At the center of the district court's analysis on the "clearly-established" inquiry was the same fundamental error that infected its merits ruling—it failed to follow the summary standard, and therefore employed the wrong facts in the clearly-established inquiry. *See, e.g.*, App.1139, 1141, R.Doc. 134,

at 23, 25 ("serious criminal violations"; "preserve the safety of officers"; "prevent . . . flight").

For example, consider the district court's use of *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012). In the district court's earlier dismissal order—the subject of *Mitchell I*—it had cited to *Bernini* to grant qualified immunity to Defendants, R.Doc. 38 at 16, and Defendants attempted to use it on appeal. But this Court rejected that argument. *Mitchell I*, 28 F.4th at 899. Unlike in *Bernini*, which the Court noted involved "'a large and potentially riotous group' . . . advancing against a police barricade 'in a threatening manner' despite repeated warnings to 'back up,'" Mr. Mitchell "was 'peacefully protesting'—neither committing a serious crime nor threatening anyone's safety nor fleeing or resisting arrest." *Id.* So "[u]nless and until discovery tells a different story, the officers are not entitled to qualified immunity." *Id.* In the *current* summary judgment order under review, the district court again used *Bernini* in granting Defendants qualified immunity, concluding that the record, as in *Bernini*, supported "serious criminal violations" and a law enforcement need to "restore law and order." App.1139, R.Doc. 134, at 23.

But, again, this characterization fails to view the facts relevant to Mr. Mitchell, and in a light most favorable to him. *See supra* Part I.

Nor can the district court's appeal to the need for "crowd control" carry the day. This Court's recent decision in *Marks* is instructive. 107 F.4th at 840. That case arose in the context of the mass protests in Minneapolis in response to the death of George Floyd; there was a "large crowd," with some individuals throwing rocks, frozen water bottles, and other objects. *Id.* at 842-43. A scuffle ensued—but then quickly ended—between the plaintiff and an officer, and another officer shot the plaintiff in the face with less-lethal force (a chemical-filled projectile). *Id.* at 843. He "sustained a ruptured eyeball, a fractured eye socket, and a traumatic brain injury." *Id.* at 842. This Court rejected qualified immunity along with the defendant's appeal to the bogeyman of "the crowd," noting that "the crowd at this moment was compliant" and was unlike the crowd in *Bernini*, "where officers suspected the individuals intended on penetrating the police line." *Id.* at 850. Rather, in *Marks* "the crowd was demonstrating no hostility toward the officers when [the defendant] shot

[the plaintiff] in the face, who was unarmed." *Id.*[14] *Marks* teaches the same lesson as *Mitchell I* does—the fact that the force here was employed in the broader context of a protest does not somehow provide a get-out-of-liability pass to the Defendants—the normal *Graham* test applies. *See Mitchell I*, 28 F.4th at 898-99; *see also* App.699, R.Doc. 111-12, at 1:19:45-1:20:32 (non-hostile crowd before shooting begins).

In all, the law had been clearly established, by 2016 at least, that it was not reasonable for either Piehl or Welk to use more than *de minimis* force against Mr. Mitchell, who was not suspected of a serious crime, was not threatening anyone, and was neither fleeing nor resisting arrest. The district court's conclusion otherwise—made by construing facts in Defendants' favor and by relying on inapposite caselaw—was error.

---

[14] The district court's citation to *Dundon v. Kirchmeier*, 85 F.4th 1250 (8th Cir. 2023), is off-target. App.1139-40, R.Doc. 134, at 23-24. That case affirmed the grant of summary judgment because "the protestors have not shown that it was clearly established as of November 2016 that a use of force designed to disperse a crowd constituted a seizure." *Dundon* 85 F.4th at 1255. Indeed, the Court in *Dundon* even distinguished this case, because here Mr. Mitchell "was arrested." *Id.* at 1256 (quoting *Mitchell I*, 28 F.4th at 894).

**III. The district court erred in granting summary judgment on Mr. Mitchell's claims against Sergeant Kennelly, Sheriff Kirchmeier, and Morton County.**

The district court granted summary judgment on Mr. Mitchell's remaining claims, noting that because neither Piehl nor Welk used excessive force when they shot at Mr. Mitchell with "bean bag" rounds, any claims against Sergeant Kennelly, Sheriff Kirchmeier, and Morton County "necessarily fail." App.1141, R.Doc. 134, at 25. The court did not examine these claims on the merits. *See id.* Since there are triable issues on the excessive force claim, *see supra* Part I, this Court should reverse the district court's grant of summary judgment on the *Monell* and failure-to-intervene claims. Additionally, municipal liability does not necessarily turn on whether individual officers can be held liable for Mr. Mitchell's excessive force claim, *see Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002) (holding individual liability not a predicate for *Monell* liability in every case), and the district court can address that question on remand.

## CONCLUSION

This Court should reverse.

Date: December 12, 2024

Respectfully Submitted,

s/ Devi M. Rao
Devi M. Rao
RODERICK & SOLANGE
  MACARTHUR JUSTICE CENTER
501 H Street NE, Suite 275
Washington DC 20002
(202) 869-3490
devi.rao@macarthurjustice.org

Vanessa del Valle
RODERICK & SOLANGE
  MACARTHUR JUSTICE CENTER
NORTHWESTERN PRITZKER
  SCHOOL OF LAW
375 East Chicago Ave.
Chicago, IL 60611

Shubra Ohri
RODERICK & SOLANGE
  MACARTHUR JUSTICE
  CENTER
906 Olive St., Ste. 420
Saint Louis, MO 63101

Counsel for Plaintiff-Appellant

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32, I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) because this brief contains 12,942 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

*/s/ Devi M. Rao*
Devi M. Rao

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Devi M. Rao*
Devi M. Rao