# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

Civil No. 24-2755

Marcus Mitchell,

*Appellant,*

v.

Kyle Kirchmeier, et al.,

*Appellees.*

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NORTH DAKOTA
## (NO. 1:19-CV-00149)
## HONORABLE JUDGE DANIEL MACK TRAYNOR

---

## BRIEF OF APPELLEE BENJAMIN KENNELLY, NORTH DAKOTA HIGHWAY PATROL SERGEANT

## ORAL ARGUMENT REQUESTED

---

State of North Dakota
Drew H. Wrigley
Attorney General

By: /s/ Jane G. Sportiello
Jane G. Sportiello
Assistant Attorney General
State Bar ID No. 08900
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Email jsportiello@nd.gov

By: /s/ Courtney R. Titus
Courtney R. Titus
Assistant Attorney General
State Bar ID No. 08810
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Email ctitus@nd.gov

Attorneys for Benjamin Kennelly, North Dakota Highway Patrol Sergeant.

# SUMMARY OF THE CASE

In March of 2022, this Court denied qualified immunity to the law enforcement defendants here, finding that Mitchell's complaint, taken as true, stated a claim for excessive force and failure to intervene. This Court declared, "Unless and until discovery tells a different story, the officers are not entitled to qualified immunity." *Mitchell v. Kirchmeier*, 28 F.4th 888, 899 (8th Cir. 2022). Now, nearly three years later, discovery has told an entirely different story.

What actually happened on the night of January 18-19, 2017, bears little resemblance to Mitchell's complaint. Nowhere is the difference more profound than in the claims against Sergeant Benjamin Kennelly. Mitchell alleged that Kennelly directed the deployment of less-lethal munitions at him and was therefore liable for failing to intervene in the allegedly excessive force. None of this is true. The undisputed facts show that Kennelly never directed the deployment of munitions at anyone, that he was entirely uninvolved in the decision to use force against Mitchell, and that he was nearly 100 yards away when Mitchell was injured, without any awareness of the force being deployed against Mitchell at the other end of the bridge. Kennelly's qualified immunity must be affirmed.

Furthermore, the undisputed facts also show that the force deployed by Bismarck Police Officer Tyler Welk and Morton County Sheriff's Deputy George Piehl – *i.e.*, a beanbag round aimed at the leg – was entirely reasonable in light of the hours-long violent riot they confronted, entitling both Welk and Piehl to qualified immunity. The district court's judgment should be affirmed in its entirety. Kennelly requests 20 minutes for oral argument for Appellees.

## CORPORATE DISCLOSURE STATEMENT

Appellee Benjamin Kennelly is sued in his individual capacity for alleged actions arising out of the course of his employment with the North Dakota Highway Patrol. He is a government employee, not a corporation, and therefore no corporate disclosure statement is required pursuant to Fed. R. App. P. 26.1 or 8th Cir. R. 26.1A.

**TABLE OF CONTENTS**

**Page**

Table of Authorities ........................................................................................iv

Statement of Issues............................................................................................1

Statement of the Case .......................................................................................2

      I.     DAPL Protests Leading Up to January 18-19, 2017 ............................2

           A.    Backwater Bridge………………………………………...........2

           B.    Law Enforcement Response…………………………...........4

      II.    Events of January 18-19, 2017................................................................6

           A.    Early Evening (7:00 – 8:00 PM)………………………...........7

           B.    Protest's Continued Growth (8:00 PM to 12:15 AM)…..............8

           C.    Attempts to Deescalate (8:00 PM to 12:15 AM)…...................9

                1.     Commands to disperse……………………...…...............10

                2.     Negotiations……………………………...…...............11

            D.    Pushes South of the Barricade (12:15 AM to 2:30)…………..13

                1.     First Push (12:15 AM to 1:00 AM)................................14

                 2.     First Push Fails to End the Riot...………...…...............16

                 3.     Second Push and Aftermath (1:26 AM – 2:30)...............17

                 4.     Kennelly's Position During the Pushes………...............19

      III.   Procedural History ................................................................................21

Summary of the Argument.............................................................................21

Argument.................................................................................23

I.      Standard of Review .................................................23

II.     There Are No Genuine Issues of Material Fact..............................24

        A.      Mitchell Misapprehends the Summary Judgment
                Standard .....................................................24

        B.      Mitchell's Misreading of the Record Fails to Show
                a Dispute of Material Fact...........................................26

III.    Defendants Are Entitled to Qualified Immunity on the
        Excessive Force Claim .................................................29

        A.      No Constitutional Right Was Violated Here....................29

                1.      The Force Applied………………………...................30

                2.      Mitchell and the Other Rioters Posed
                        an Immediate Threat....................................32

                3.      Severe Crimes Were at Issue Here……………………..33

                4.      Mitchell and the Others Were Resisting
                        Arrest and Evading Arrest by Flight .............................35

                5.      Other Factors………………………………...................36

                6.      Conclusion as to Reasonableness…………….................37

        B.      Even if a Constitutional Right was Violated, It Was
                Not Clearly Established ...........................................37

IV.     Kennelly's Qualified Immunity on the Failure to Intervene Claim
        Must Be Upheld.............................................................39

        A.      Mitchell Cannot Show a Violation of a Constitutional Right ..40

1.  Kennelly did not observe the use of excessive force......41

2.  Kennelly had neither the opportunity nor the means to intervene .....................................................................43

B.  Mitchell cannot show that any right was clearly established ..................................................................44

V.  Conclusion..............................................................................45

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                  **<u>Page(s)</u>**

*Atwater v. City of Lago Vista,*
    532 U.S. 318 S. Ct. 1536 L. Ed. 2d 549 (2001) ...........................................45

*Beard v. Falkenrath,*
    97 F.4th 1109 (8th Cir. 2024).........................................................................39

Bernini v. City of St. Paul*,*
    665 F.3d 997 (8th Cir. 2012)...................................... 1, 32, 33, 34, 38, *passim*

*Chambers v. Pennycook,*
    641 F.3d 898 (8th Cir. 2011) ................................................................. 30, 31

*Cravener v. Shuster,*
    885 F.3d 1135 (8th Cir. 2018).............................................................. 30, 36

*Dimock , Tr. for Heirs of Dimock-Heisler v. City of Brooklyn Ctr.,*
    124 F.4th 544 (8th Cir. 2024)........................................................................24

*Dixon v. Lowery,*
    302 F.3d 857 (8th Cir. 2002).........................................................................44

*Drew v. City of Des Moines,*
    111 F.4th 881 (8th Cir. 2024).................................................. 23, 24, 29, 40

*Dundon v. Kirchmeier,*
    85 F.4th 1250 (8th Cir. 2023)........................................................................3

*Gibson v. Am. Greetings Corp.,*
    670 F.3d 844, 853 (8th Cir. 2012)................................................................23

*Graham v. Connor,*
    490 U.S. 386 (1989) ................................................................. 1, 29, 30, 33

*Grider v. Bowling,*
    785 F.3d 1248 (8th Cir. 2015)................................................................ 1, 43

*Krout v. Goemmer,*
   583 F.3d 557 (8th Cir. 2009) ..........................................................43

*Liggins v. Cohen,*
   971 F.3d 798 (8th Cir. 2020) .........................................................26

*Lonesome Dove Petroleum, Inc. v. Holt,*
   889 F.3d 510 (8th Cir. 2018) .........................................................23

*Lombardo v. City of St. Louis,*
   38 F.4th 684 (8th Cir. 2022)..........................................................44

*Malone v. Hinman,*
   847 F.3d 949 (8th Cir. 2017) .........................................................25

*Marks v. Bauer,*
   107 F.4th 840 (8th Cir. 2024)................................................. 37, 38

*Mitchell v. Kirchmeier,*
   28 F.4th 888 (8th Cir. 2022)........................................ 1, 29, 40, 45

*Pace v. City of Des Moines,*
   201 F.3d 1050 (8th Cir. 2000) .......................................................25

*Rivas-Villegas v. Cortesluna,*
   595 U.S. 1, 5 (2021).............................................................. 37, 44

*Roach v. City of Fredericktown, Mo.,*
   882 F.2d 294 (8th Cir. 1989).........................................................31

*Robinson v. Payton,*
   791 F.3d 824 (8th Cir. 2015).................................................. 1, 40

*Rusness v. Becker Cnty.,*
   31 F.4th 606 (8th Cir. 2022)..........................................................24

*Scott v. Harris,*
   550 U.S. 372 (2007) .............................................................. 24, 26

*Torgerson v. City of Rochester,*
   643 F.3d 1031 (8th Cir. 2011)........................................................24

*Uhiren v. Bristol-Meyers Squibb Company, Inc.,*
   346 F.3d 824 (8th Cir. 2003) .......................................................................23

*Wallingford v. Olson,*
   592 F.3d 888 (8th Cir. 2010) .......................................................................25

*White v. Jackson,*
   865 F.3d 1064 (8th Cir. 2017).......................................................................38

*Williams v. Decker,*
   767 F.3d 734 (8th Cir. 2014) .......................................................................23

**STATEMENT OF ISSUES**

I.   Whether Piehl and Welk are entitled to qualified immunity against Mitchell's excessive force claim when they deployed less-lethal munitions aimed at Mitchell's leg after hours of rioting.

*Graham v. Connor*, 490 U.S. 386 (1989)

*Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012)

II.  Whether Benjamin Kennelly is entitled to qualified immunity on Mitchell's failure to intervene claim when he was nowhere near the scene of Mitchell's injury and had no awareness of the plan to use force.

*Robinson v. Payton*, 791 F.3d 824 (8th Cir. 2015)

*Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022)

*Grider v. Bowling*, 785 F.3d 1248 (8th Cir. 2015)

## STATEMENT OF THE CASE

Mitchell's recitation of the facts is incomplete. A full recitation follows below.

## I.    DAPL Protests Leading Up to January 18-19, 2017

By the evening of January 18, 2017, North Dakota law enforcement had been responding to civil unrest at the DAPL protests for more than five months. (Aple.App.47[1], 52; R.Doc.95-10 at 21:11-13, 43:19-44:7.) The first protest response occurred on August 10th, 2016 in Morton County, North Dakota. *Id.* Within a week, Morton County declared a state of emergency based on the growing number of protestors and ongoing civil unrest; within another week, the State of North Dakota issued its own emergency declaration. (Aple.App.53; R.Doc.95-10 at 45:8-13.) By early October, the protests included an estimated 3,000 persons and continued to grow. *Id.* at 50:8-18.

While protests against DAPL occurred in numerous locations across the region, a focal point for the unrest was the Backwater Bridge in Morton County, North Dakota. (Aple.App.494, 556; R.Doc. 106-20 at 44:3-7, 106:14-19.) *See also Dundon v. Kirchmeier,* 85 F.4th 1250, 1254 (8th Cir. 2023) (describing bridge). The confrontations between protestors and law enforcement on the Backwater Bridge leading up to January 18, 2017 provide context for the events of that evening.

### A.    Backwater Bridge

The Backwater Bridge runs north to south and carries Highway 1806 across Cantapeta Creek. (Aple.App.35; R.Doc. 26-6.) On October 27, law enforcement had

---

[1] "Aple.App." refers to the Appendix submitted by City and County Appellees. "App." refers to the Appellant's Appendix.

moved the protestors off of private land north of the Cantapeta Creek and pushed them south across Backwater Bridge. *See* Steele Dep., App.849; R.Doc.111-16 at 54:10-15 (describing "north camp push"); *see also* Aple.App.115-116; R.Doc.96 at ¶19. During this confrontation, described by one witness as "extreme chaos," a protestor shot multiple rounds from a handgun while she was being arrested by law enforcement. (App.856; R.Doc.111-16 at 55:3-8, 83:1-9.)

On October 28, due to the damage caused to the bridge by the protestors the day before, the bridge was officially closed by the Department of Transportation. (Aple.App.35; R.Doc. 26-6.) Law enforcement erected a barricade at the north end of the bridge consisting of two dump trucks chained to concrete barriers covered in barbed wire. (App.200; 111-4 at 115:12-20.) *See also Dundon*, 85 F.4th at 1254 (describing barrier). Importantly, while the law enforcement barricade was located at the north end of Backwater Bridge, the entire bridge was closed to public access. (Aple.App.110; R.Doc.95-10 at 275:25-276:9; Aple.App.35; R.Doc.26-6.) All unauthorized persons were trespassing and in violation of the law. (Aple.App.115-116; R.Doc.96 at ¶¶17-18.)

Even after October 28, protestors continued to attempt to harm the barricade; in one notable example, protestors actually used a semi-truck to pull away one of the burned-out dump trucks but were stopped by law enforcement from removing the other, leading to another massive protest. (App.533-534; R.Doc. 111-5 at 288:12-290:1.) *See also Dundon* at 1254 (describing protestors' use of semi and subsequent protest). Indeed, Mitchell himself was caught on video cutting concertina wire off the top of the barricade, two nights before his injury, and explained that he wanted

to "clear the public access roadway." (App.234-235; R.Doc.111-4 at 149:21-150:2). Nevertheless, the barricade was still standing by January 18-19, 2017.

### B.    Law Enforcement Response

As the number of protestors rapidly grew from dozens to hundreds to thousands, law enforcement worked together to handle the unprecedented civil unrest. Individual law enforcement officers spent large amounts of times at the protest site. *See* Welk Dep., App.484; R.Doc.111-5 at 88:25-89:7 ("[T]his went on for months, and I was down there for a lot of it."); *see also* Piehl Dep., App.905; R.Doc.111-17 at 52:8-19 (same). Officers would respond to protest sites in several ways. (App.615; R.Doc.111-7 at 57:4-9.) One of these was responding on an emergency basis in response to a Code Red callout. (App.615; R.Doc. 111-7 at 57:4-9.) The Code Red system was an emergency alert system used when protestors and rioters threatened to overwhelm the law enforcement personnel already present at the scene. (Aple.App.502; R.Doc.106-20 at 52:19-24.) *See also* Steele Dep., App.844; R.Doc.111-16 at 33:23-34:3 ("Usually when it got to the point of riotous conditions, when there was stuff thrown at them, and they were severely outnumbered, and whoever was in charge at the time down there felt . . . the safety of the officers were in jeopardy, they would call a code red.")

Another way that law enforcement would respond to a protest site was by way of a pre-scheduled shift. (App.615; R.Doc.111-7 at 57:4-9.) One of the positions which individual officers would be scheduled to fill on a shift basis was the role of forward commander. A forward commander would generally direct the positions of law enforcement officers at a protest site in order to facilitate safety and enforce the

laws. (App.615; R.Doc.111-7 at 59:7-9, 21-25.) The forward commander would receive orders and directives from the Tactical Operations Center, or TOC. (App.617-618; R.Doc.111-7 at 68:12-25, 69:2; App.715; R.Doc.111-13 at 54:24-55:6.) The Tactical Operations Center was set up at the law enforcement center in Morton County, and was staffed by a rotating assortment of law enforcement leaders. (App.841; R.Doc.111-16 at 23:21-24:16.)

The identity of the forward commander would change from night to night as the position rotated to different officers. (App.715; R.Doc.111-13 at 53:17-54:1.) Accordingly, individual responding officers might not actually know the identity of the forward commander at a particular protest response. Detective Olsen testified about the forward command position that he knew there was "several people that would be in charge," and while he knew someone was in charge when he responded on January 18, he didn't know their name. (Aple.App.708, 709; R.Doc.106-20 at 258:24-259:-8.)

Often, individual officers responding to DAPL would report to supervisors from their own agency, who would then communicate with the forward commander. Officer Welk testified that, when responding to DAPL protests, "[W]hat we would do as SWAT guys is we usually fall within our own command structure. So we would just listen to whoever was there from the SWAT team who was in a position of leadership." (App.481; R.Doc.111-5 at 78:1-4.) Cameron McClenahan, at the time a deputy with the Morton County Sheriff's Office, described looking to Morton County officers for guidance: "[T]hat was my chain of command. So, no, to the other agencies." (App.1049; R.Doc.111-43 at 67:4-12.) James Ellefson, at the time a

deputy of the Morton County Sherriff's Office, testified that when responding to a Code Red, officers would "respond to our direct supervisor, whoever was working for Morton County. Whether they were the incident commander at the time or not, they would be the ones that would be communicating with whoever was going to be in charge." (Aple.App.280; R.Doc.106-18 at 137:20-25.)

Along similar lines, officers responding to DAPL continued to follow their own agency's use of force policies. There was not a specific policy that governed law enforcement actions as a whole at Standing Rock – rather, the policies governing each individual were those of their own agency. (App.618; R.Doc.111-7 at 71:19-22.) *See also* Stugelmeyer Dep., App.718; R.Doc.111-13 at 65:6-9 (testifying that as forward command, "We have to rely on officers making independent decisions based on their policy . . . the agency they came from.")

Along similar lines, law enforcement treated use of less-lethal force as a personal decision. Kennelly explained that it was up to each individual officer to justify any use of force. (App.618; R.Doc.111-7 at 184:21-185:1.) Detective Olsen testified that the use of force had to be an individual determination by an individual officer – "That's what use of force is." (Aple.App.709; R.Doc.106-20 at 259:12-22.) Officers would make the decision to use a weapon "based on their own training and experience and decision-making." (Aple.App.610; R.Doc.106-20 at 160:10-14.)

## II. Events of January 18th-19th, 2017

The night of Mitchell's injury was the third day in a row where a Code Red callout was issued. (App.854; R.Doc.111-16 at 75:6-11.) Mitchell's injury occurred soon after 1:30 AM on January 19, 2017, as explained below.

In addition to the copious eyewitness reports from the responding officers, much of the night is captured on video. A NEST camera was mounted at the barricade itself, which recorded the evening in 30-minute videos. These videos do not have sound. Additionally, there is a longer video which captures footage from a handheld camera carried by a member of law enforcement. *See* App.699; R.Doc. 111-12. The camera accompanied law enforcement south of the barricade several times, and it captured sound, though some of the audio is hard to hear because of the background noise.

### A.    Early Evening (Apprx. 7:00 – 8:00 PM)

On January 18, 2017, Sergeant Benjamin Kennelly was assigned to serve as the night shift forward command. (App.623; R.Doc.111-7 at 91:14-24.) When he arrived at Backwater Bridge, he conferred with the day shift forward commander and learned that protestors had built a teepee on Backwater Bridge. (App.624; R.Doc.111-7 at 94:3-6; Aple.App.126; R.Doc. 99-1 at 1.) Sergeant Kennelly accompanied the day shift officers south of the barricade and assisted them in removing the teepee.[2] (App.624; R.Doc.111-7 at 94:21-23; Aple.App.126; R.Doc. 99-1, at 1.) The video shows that officers carrying the teepee poles lifted them back over the north side of the barricade around roughly 7:40 PM. (Aple.App.139;

---

[2] A note on numbering: later in the evening, officers make two "pushes" onto the bridge south of the law enforcement barricade, at 12:15 AM and 1:26 AM. But some eyewitnesses, including Mitchell, also describe this ~7:00 PM trip as a "push," in itself, even though it occurred before main protest had started. As such, at some places in the record, the 7:00 PM trip south of the barricades is referred to as the "first push," and the 12:15 AM and 1:26 AM events are the "second" and "third" push, respectively. Other officers call the 12:15 AM push the "first" push.

R.Doc.106-4, Nest Video 7:29 PM at timestamp 10:00.) Roughly 15 minutes later, protestors begin to approach the law enforcement barricade. *Id.* at timestamp 25:00.

## B. Protest's Continued Growth (Apprx. 8:00 PM to 12:15 AM)

Over the next few hours, law enforcement remained north of the barricade while the protest crowd grew in numbers and violent behavior. Sergeant Kennelly's count grew from 50 protestors at 8:00 PM to 175 protestors at 10:20 PM. (Aple.App.126; R.Doc. 99-1 at 1.) After several attempts by Sergeant Kennelly to negotiate the protestors off the bridge, described further below, video shows the growing crowd began throwing ice chunks around 8:38 PM. (Aple.App.141; R.Doc.106-6, Nest Video 8:29 PM at timestamp 8:25.) At 9:13 PM, Sergeant Kennelly requested a local, off-duty code red. (Aple.App.126; R.Doc.99-1 at 1.)

During this period, the officers witnessed violent, destructive, and illegal behavior from the protestors. Officer Olsen saw ice, water bottles, and road flares that were lit being thrown by protestors at law enforcement, as well as razor wire being cut by the protestors. (Aple.App.644, 645; R.Doc.106-20 at 194:4-8, 195:19-25.) Detective Welk saw ice chunks and water bottles being thrown by protestors at law enforcement, and an individual trying to flank law enforcement's barricades. (App.515; R.Doc.111-5 at 214:15-21; App.532-533; R.Doc.111-5 at 284:24-285:3.) Lieutenant Stugelmeyer saw protestors throwing ice chunks and snowballs at law enforcement, starting a fire on the bridge with tires, using high candlepower spotlights to blind law enforcement, and erecting a second teepee on the bridge. (App.740; R.Doc.111-13 at 154:1-11; App.737; R.Doc.111-13 at 143:1-10; App.741; R.Doc.111-13 at 158:4-18; App.752; R.Doc.111-13 at 204:4-16.) Ellefson

saw bottles, rocks, logs, and lug bolts being thrown at officers. (Aple.App.343; R.Doc.106-19 at 165.) Deputy Piehl saw protestors throwing concertina wire and pulling concertina wire off the barricades, and throwing an ice chunk at him and other officers. (App.922; R.Doc.111-17 at 120:16-20; App.925; R.Doc.111-17 at 132:10-133:6.) Deputy Piehl was also personally hit in the hand with a frozen water bottle. (App.927; R.Doc.111-17 at 137:16-20; Aple.App.131; R.Doc. 100-1.) Sergeant Steele observed a second teepee being set up on the bridge, a fire on the bridge, and "riotous behavior. They were throwing whatever they could get their hands on at us, disobeying lawful orders, trespassing. We had one officer get hit in the head with a frozen water bottle. I think there was a total of six injuries, six law enforcement injuries that night, I believe, it was reported." (App.854; R.Doc.111-16 at 74:24-75:11.)

## C. Attempts to De-Escalate (Apprx. 8:00 PM to 12:15 AM)

For hours while the above violent, destructive, and illegal behavior was occurring, Sergeant Kennelly and his fellow officers attempted to deescalate the situation. *See* Kennelly Dep. at App.645-646; R.Doc.111-7 at 180:16-181:8. ("Several conversations were had throughout the several hours in the evening to negotiate them removing themselves from the area as well as explanations to them. Multiple times they were spoken to. Deals were attempted to be made. I feel like there was several attempts at de-escalation prior to it getting to the point that we had to arrest anyone.") Some of Kennelly's attempts took the form of repositioning officers. *See* Aple.App.126; R.Doc.99-1 at 1 ("I backed off the viper team to de-

escalate the situation."). Other techniques included such as repeated commands to disperse and repeated attempts to negotiate.

### 1. Commands to disperse

Repeatedly through the night, law enforcement issued commands to disperse. *See, e.g.,* Aple.App.644; R.Doc.106-20 at 194:14-16 (Olsen testifying, "[T]here was one person on the loudspeaker repeatedly telling them that they need to leave the bridge."); *see also* Aple.App.657; R.Doc.106-20 at at 207:4-8 (Olsen testifying, "[E]verybody had said get off the bridge. It was a constant thing that was happening."); *see also* Aple.App.330; R.Doc.106-19 at 152:23-25 (Ellefson testifying, "The individuals that were refusing to disperse and get off the bridge were told and instructed to leave."); *see also* App.924; R.Doc.111-17 at 128:19-24 (Piehl testifying that he heard the commands "please disperse, get off the bridge," multiple times); *see also* App.626; R.Doc.111-7 at 103:5-12 (Kennelly testifying that "Anyone on the bridge at the time we proceeded south had been given several opportunities to leave the area and informed that they were now in commission of several offenses to include felony-level rioting, trespassing, simple assault, aggravated assault on peace officers; therefore, anyone remaining in the area was in violation of said crime.") Sergeant Steele testified that the fact the protestors were trespassing and going to be arrested was "constantly relayed to the entire crowd anytime anybody came off of that bridge. It was usually played over a loudspeaker over and over and over again." (App.854; R.Doc.111-16 at 70:2-4.)

## 2. Negotiations

In addition to the warnings and commands to disperse, Sergeant Kennelly and other officers made multiple attempts to negotiate with the protestors and encourage their removal from the bridge. The first conversation with protestors occurred around 8:15 PM, when Sergeant Kennelly approached the barricades to negotiate the return of the protestors' teepee poles in exchange from them clearing the bridge and staying off. Aple.App.140; R.Doc.106-5, Nest Video 7:59 PM at timestamps 13:57 to 15:09; Aple.App.126; R.Doc.99-1 at 1. As the video reflects, the protestors did not leave the bridge. *See generally id.* after timestamp 15:09.

Sergeant Kennelly again approached the bridge around 8:27 PM, when he had a second conversation with the protestors. Aple.App.140; R.Doc.106-5, Nest Video 7:59 PM at timestamps 27:15 to end; Aple.App.141; R.Doc.106-6, Nest Video 8:29 PM at timestamps 0:00 to 3:28; Aple.App.126, R.Doc.99-1 at 1. However, the protestors remained on the bridge, and shortly thereafter started throwing ice chunks. (Aple.App.141; R.Doc.106-6, Nest Video 8:29 PM at timestamp 8:25 until end.)

Around approximately 10:20 PM, Sergeant Kennelly was again called down to speak to protestors on the east flank of the bridge who wanted to negotiate a snowball fight. (Aple.App.127; R.Doc.99-1 at 2.) In response, he denied their request and "explained again that they were trespassing and engaging in a riot. This had also been addressed to the initial group of agitators earlier." *Id.*

Around 11:25 PM, Sergeant Kennelly made yet another attempt to negotiate with the protestors, this time accompanied by Lieutenant Stugelmeyer. App.696; R.Doc.111-9, Nest Video 10:59 PM  at timestamps 26:25 until end, App.697;

R.Doc.111-11, Nest Video 11:29 PM at timestamps 00:00 until 8:15. Kennelly testified that he and Lieutenant Stugelmeyer approached the protestors to talk, and the purpose of this conversation was "further de-escalation attempt to get them to remove themselves, addressing the current crimes that were being committed." (App.629; R.Doc.111-7 at 113:17-23.) He explained "We were providing lawful commands to have them remove themselves from the area due to committing the crime." (App.629; R.Doc.111-7 at 114:9-16.) Lieutenant Stugelmeyer described the conversation as, "we wanted everything to stop, and we were in a negotiation to get them to do that." (App.738; R.Doc.111-13 at 147:23-148:2.) Sergeant Kennelly and Lieutenant Stugelmeyer offered the protestors their teepee poles back if they would leave the bridge and stop committing criminal activity. (App.629; R.Doc.111-7 at 113:17-23; App.738; R.Doc.111-13 at 148:5-9.) Ultimately, Sergeant Kennelly testified that he spoke with the protestors at this point "[i]n another, again, attempt to de-escalate the situation in order to get them to disperse **without anyone having to go to jail.**" (App.628; R.Doc.111-7 at 110:6-8.) (emphasis added).

At roughly 11:46 PM, Sergeant Kennelly and Lieutenant Stugelmeyer again approach the barricades in an attempt to negotiate. (App.697; R.Doc.111-11, Nest Video 11:29 PM at timestamps 16:00 until 18:37.) This final conversation is partially captured on the handheld camera video. App.699; R.Doc.111-12, Handheld Camera Video. At least one protestor cries out something along the lines of, "We don't need the teepee poles. We got more." (App.699; R.Doc.111-12, Handheld Camera Video, at timestamp 17:00). Shortly thereafter, Sergeant Kennelly and Lieutenant Stugelmeyer leave the barricade again.

Marcus Mitchell is visible in many videos of the evening, and is visible nearby when the above conversation between protestors, Sergeant Kennelly, and Lieutenant Stugelmeyer was occurring. He described the conversation as a negotiation. (App.313; R.Doc.111-4 at 228:3-8.) He recalled the protestors mentioning they weren't interested in getting the teepee poles back anymore. (App.314; R.Doc.111-4 at 229:5-14.) He testified as follows regarding his contribution to the negotiation:

> Q.    Did you say anything to the officers during that discussion?
>
> A.    Yes.
>
> Q.    And what did you say?
>
> A.    "Fuck you."
>
> (App.311-312; R.Doc.111-4 at 226:24-227:3.)

**D.    Pushes South of the Barricade (Apprx. 12:15 AM to 2:30)_**

At or around the time the protestors rejected the final negotiation attempt, they erected a second teepee on the bridge. (App.631; R.Doc.111-7 at 121:1-3.) *See also* Aple.App.127; R.Doc.99-1 at 2 ("At this time I saw a second tepee structure go up on the bridge. We feel back and touched base with TOC.")

After the final negotiation attempt failed to de-escalate the scene, Kennelly contacted the Tactical Operation Center and had a conversation about trying to calm or disperse the crowd. *See* Kennelly Dep., App.625; R.Doc.111-7 at 99:14-23 ("After several hours of attempt at de-escalation and numerous accounts of violence occurring and numerous dispersal commands given for the riotous activity and trespassing, crimes in progress, a second teepee was erected, at which point a conversation was had with TOC in regards to trying to calm or disperse the crowd.")

The TOC gave Sergeant Kennelly permission to send law enforcement south of the barricade to effect arrests. (App.625; R.Doc.111-7 at 100:4-7.) When asked why he thought it necessary to effect arrests, Sergeant Kennelly testified:

> At some point, with the number of hours and attempts at de-escalation, at the end of the day, we are there to uphold and protect the laws and citizens. At that point, they'd had ample opportunity to remove themselves from the crime they were currently committing and not get arrested, and it was felt that the only way we could do that is by actually taking people into custody.

(App.627; R.Doc.111-7 at 105:1-9.)

By that point in the evening, officers believed they had probable cause for multiple crimes, including rioting, trespassing, simple assault, and aggravated assault on peace officers. (App.626; R.Doc.111-7 at 103:5-12.)

### 1. First Push (Apprx. 12:15 AM to 1:00 AM)

After Sergeant Kennelly received permission from the TOC, two "pushes" occurred in which law enforcement crossed south of the barricade and down the length of Backwater Bridge. (App.626; R.Doc.111-7 at 104:1-11.)

Before the first push, Kennelly called officers to the middle of the area north of the barricade, and explained that they would go south of the bridge and effect arrests. (App.628; R.Doc.111-7 at 109:2-12.) Neither during this conversation nor at any other time on the night in question did Sergeant Kennelly direct any officer to deploy force against the protestors in conjunction with the pushes. (App.627; R.Doc.111-7 at 105:21-24.) He did not identify any agitators to target for arrest during the pushes, nor was there any discussion about which protestors should be arrested. (App.627; R.Doc.111-7 at 105:21-106:2.) The only directions related to

force that Sergeant Kennelly gave that evening was that "if you are going to use force, it is to protect yourselves or others or the minimal amount of force needed to effect an arrest." (App.638; R.Doc.111-7 at 150:6-10.)

At roughly 12:15 AM, the first officers performing the push are visible on the Nest camera, on the west flank of the bridge. App.697; R.Doc.111-10, Nest Video 11:59 PM, at timestamp 15:45. For the next 45 seconds, protestors disperse rapidly south, until they are no longer visible from the NEST camera. *See generally id.*, at timestamp 15:45 to 16:30.

During this push, the teepee was disassembled and the poles were brought back north of the barricades. (App.697, R.Doc.111-10; Nest Video 11:59 PM at timestamp 23:00.) Law enforcement collected protestor weapons and equipment, such as a crowbar, the lights used for blinding, and multiple handheld shields, and threw them on the law enforcement side of the barricade. (App.755; R.Doc.111-13 at 216:7-13.) Law enforcement made 19 total arrests during the first push. (App.632; R.Doc.111-7 at 128:3-7; Aple.App.127; R.Doc. 99-1 at 2.) Mitchell remembered seeing officers arrest protestors during the first push. (App.373; R.Doc.111-4 at 288:3-16.)

The events near the end of the push were captured by the handheld camera. (App.699; R.Doc.111-12, Handheld Camera Video, at timestamp 48:00 to 58:00.) These events include protestors forming a defensive line and advancing forward towards law enforcement in direct defiance of law enforcement orders to stay back. *Id.* Mitchell is visible around timestamp 56:28. By roughly 1:00 AM, all law

enforcement had returned to the north side of the barricades. (Aple.App.127; R.Doc. 99-1 at 2.)

## 2. The First Push Fails to End the Riot

When the first push was happening, law enforcement officers remained hopeful that the push itself would suffice to end the unlawful and violent behavior. Lieutenant Stugelmeyer testified that during this push, law enforcement tried to systematically find agitators to de-escalate the situation "so we could all go home." (App.754-755; R.Doc.111-13 at 212:24-213:8.) Detective Welk explained that even these agitators could have avoided the use of less-lethal force, if they "[s]imply walked back, walked south and got off the bridge," or "put their hands up and walked towards law enforcement to be taken into custody." Sergeant Steele testified "We were hoping they would just go. Hoping they would just go back. Like I said, we didn't want to make arrests. We just wanted them to go back and to be peaceful again." (App.858; R.Doc.111-16 at 91:20-25.) Sergeant Kennelly testified that if a protestor had avoided arrest during the first push and then left the bridge altogether, law enforcement would not have pursued them. (App.646; R.Doc.111-7 at 183:17-22.)

But the protestors did not go back. In a "matter of minutes" after the first push ended, protestors had proceeded back up the bridge and were on the barricades, taunting law enforcement. (App.755; R.Doc.111-13 at 216:20-24.) *See* Aple.App.142, R.Doc.106-14; Nest Video 12:30 AM at timestamp 27:00 (as final officers withdraw from flanks, returning protestors are visible in the distance). Roughly five minutes later, the video shows that the protestors have returned and

Marcus Mitchell climbs back on top of the law enforcement barricade. *See* Aple.App.143, R.Doc.106-15; Nest Video 12:59 AM at timestamp 2:30.

### 3. Second Push and Aftermath (Apprx. 1:26 AM – 2:30)

Soon thereafter, Sergeant Kennelly ordered a second push because the first push did not successfully disperse the crowd. (App.632; R.Doc.111-7 at 128:3-18.) He called all officers back to the front and explained that they were going to conduct a second push. *Id.*

The second and final push commenced at roughly 1:26 AM on January 19th. *See* Aple.App.143, R.Doc.106-15; Nest Video 12:59 AM at timestamp 27:00. Notably, this push commences than five hours after Sergeant Kennelly's first attempt to negotiate with protestors, which occurred at 8:15 PM as set forth above.

Importantly, Mitchell asserts he was always out of reach of officers as he would proceed south ahead of offices as they engaged in the pushes. (App.316-318; R.Doc.111-4 at 231-233.) At the beginning of the last push, Mitchell is visible walking and eventually running down the bridge away from law enforcement as proceed down the bridge. *See* Aple.App.143, R.Doc.106-15; Nest Video 12:59 AM at timestamp 27:15 to 27:45.[3]

The next time Mitchell is visible on the handheld camera, he has joined a line of protestors opposing law enforcement with shields. The events leading to Mitchell's injury are visible at App.699; R.Doc.111-12, starting roughly at

---

[3] Earlier in the night, Mitchell can be seen running out of reach of law enforcement in App.696; R.Doc. 111-9, Nest Video 10:59 PM at timestamp 5:30, and then, when law enforcement backs away, returning to his old position.

timestamp 1:19:00. The events portrayed in this portion of the video took place at the south end of Backwater Bridge. (Aple.App.710; R.Doc.106-20 at 260:11-20.) Regarding the minutes leading to Mitchell's injury, Piehl testified that Sergeant Steele pointed out to Piehl the people to be arrested during the final push. (App.916; R.Doc.111-17 at 93:13-24.) Mitchell was one of the individuals identified by Steele to be arrested. (App.916; R.Doc.111-17 at 94:1-18.) Piehl passed this information from Steele on to Welk. (App.489; R.Doc.111-5 at 111:1-22.) Steele did not tell Piehl to use less lethal against Mitchell – that decision was made by Piehl. (App.916, 921; R.Doc.111-17 at 95:2-4, 114:18-115:16.) Piehl heard other officers yelling commands to disperse and get off the bridge multiple times. (App.924; R.Doc.111-17 at 128:15-23.) Piehl aimed a few inches above Mitchell's left knee, and below the shield Mitchell was holding from an approximate distance of 18 to 20 yards. (App.921; R.Doc.111-17 at 113:7-13.) Piehl did not see whether his bean bag actually struck Mitchell and the officer arrest team ran forward obstructing his view thereafter. (App.921; R.Doc.111-17 at 113:18-23.)

Steele did not tell Piehl why Mitchell was to be arrested, and Piehl did not ask why "[b]ecause an officer that witnesses crimes or knows that the other crimes, any officer can make the arrest in that situation." (App.916; R.Doc.111-17 at 94:24-95:1.) Piehl already knew "[e]verybody at that time was trespassing and had ran from us and came back multiple times and was subject to arrest. Each time that we tried to effect that arrest they ran, so, yes, we were using less lethal first to get the people that were wanted definitely placed under arrest to try to stop them from running away." (App.921; R.Doc.111-17 at 115:1-7.)

When viewing the video of the moments before Mitchell's injury at the south side of the bridge, Piehl testified audible orders couldn't have come from Kennelly, because "Kennelly was never out here." (App.935; R.Doc.111-17 at 172:3-7.) He testified that the only order Kennelly ever gave him was which side of the bridge to go on when Piehl first reported for duty. (App.918; R.Doc.111-17 at 104:21-23.)

In terms of the justification for arrest, Piehl testified: "This was our second or third trip down the bridge and they kept coming back. They were throwing multiple things at us, **we had to make the arrests and stop this**." (*Id.* at 138:20-23.)

Tyler Welk was another individual who deployed one round of less-lethal at Mitchell. He stated that "I was informed by Command Staff that we would deploy less lethal at the two agitators that had been identified and they would then be taken into custody." (Aple.App.137; R.Doc.103-1 at 1.) Welk explained that his references to "Command Staff" refer to Bismarck Lieutenant Jason Stugelmeyer, who was a senior officer within the same law enforcement agency as Welk. (App.518, 490; R.Doc.111-5 at 226:6-19, 116:18-24.) It was Welk's understanding that Mitchell and all of the other protesters remaining on the bridge during that third and final push were engaged in illegal conduct, including criminal trespass and engaging in a riot, and subject to arrest. (App.533; R.Doc.111-5 at 285:4-9.) Welk observed the one round he fired at Mitchell impact his lower extremity. (Aple.App.138; R.Doc.103-1 at 2.)

### 4.    Kennelly's Position During the Pushes

During each of the pushes and in between them, Sergeant Kennelly stayed north of the law enforcement barricades while the officers performing the push went

south. (App.627, 646; R.Doc.111-7 at 108:14-18; 181:23-182:5.) The barricade was too high to see over, and as Kennelly stood on the north side, he could not see what was happening on the south side of the bridge. (App.646; R.Doc.111-7 at 182:6-12.) He also did not hear any bean bag rounds going off, due to the deafening volume of the protest scene. (App.627; R.Doc.111-7 at 107:1-13.) Mitchell's injury occurred at the southern end of Backwater Bridge, *i.e.*, at the opposite end of the bridge from the barricade. (Aple.App.710; R.Doc.106-20 at 260:14-20.) It was nearly 100 yards between Kennelly's position north of the barricade to the other end of the bridge. (App.627; R.Doc.111-7 at 183:1-3.)

Sergeant Kennelly never directed any officer to deploy force against the protestors in conjunction with the pushes on January 18th-19th, 2017. (App.627; R.Doc.111-7 at 105:21-24.) He never identified any agitators to target for arrest during the pushes. (App.627; R.Doc.111-7 at 105:24-106:4.) When he gave the direction for the push, there was no discussion about specifically who among the protestors should be arrested. (App.628; R.Doc.111-7 at 109:16-19.) He did not know if anyone else identified agitators to arrest or remove during the pushes. (App.627; R.Doc.111-7 at 106:3-7.) He doesn't recall anyone identifying any agitators to him during the period of January 18th-19th, 2017. (App.632; R.Doc.111-7 at 126:6-9.) He did not know who was attempting to effect an arrest of Marcus Mitchell. (App.634; R.Doc.111-7 at 133:22-134:2.) He did not know whether there was a plan to use force against Marcus Mitchell. (App.637; R.Doc.111-7 at 147:17-22.) At no point during the night in question did he direct an officer to deploy their weapon. (App.646; R.Doc.111-7 at 184:9-13.)

Sergeant Kennelly was not on the frontline when Mitchell was shot, he did not witness Mitchell getting shot with a beanbag round, and he did not witness his arrest. (App.634; R.Doc.111-7 at 136:12-20.) Sergeant Kennelly first learned of Mitchell's injury when another officer returned to the north side of the barricade and showed him a picture on his phone, at which point Kennelly immediately radioed for an ambulance. (App.633, 640; R.Doc.111-7 at 129:18-23, 169:20-170:1.)

## III. PROCEDURAL HISTORY

Mitchell filed his Complaint on July 18, 2019, alleging a claim for excessive force against Piehl and Welk and a claim for failure to intervene against Kennelly. *See* R.Doc.1. The district court initially dismissed the case on the pleadings, R.Doc.38, but its dismissal was reversed in part by this Court, and the claims for excessive force regarding Piehl and Welk and the claim for failure to intervene against Kennelly were remanded to the district court. *See* R.Doc.42, 42-1. After discovery, all defendants moved for summary judgment. *See* R.Doc.93, 106. The district court granted the motions. *See* R.Doc.129. This appeal followed.

## SUMMARY OF THE ARGUMENT

For hours prior to the use of force against Mitchell, law enforcement did everything they could to avoid it. Faced with an illegal riot on a closed state highway, the responding officers spent hours trying to deescalate the protests through verbal warnings, negotiations, and orders to return to camp. All the while, protestors continued to act violently and defied law enforcement commands. Four hours in, the officers finally decided to make arrests, and even then the unrest could have ended: Mitchell was one of many who evaded the first round of arrests, and would have

avoided further interaction had he remained off Backwater Bridge for good. But Mitchell decided otherwise. Continuing to trespass, he returned to the bridge, emerged at the front of the protests and climbed onto the law enforcement barricade. Once again, law enforcement tried to make arrests, and once again, Mitchell successfully fled. Finally, at the end of the bridge, he stopped running – but not to turn himself in. Instead, Mitchell turned and resisted the line of officers from behind a plastic shield. At this point, Piehl and Welk each deployed a bean-bag round aimed at Mitchell's leg. There is no evidence that either of these rounds struck Mitchell in the left eye; multiple other officers were also deploying bean bag rounds that night. But as to the decision of Piehl and Welk to deploy a round at Mitchell's leg, it was reasonable in light of the scene confronting them. The officers acted reasonably, but at this point, they simply had no alternative. In a society predicated upon the rule of law, law enforcement sometimes has to use force to maintain law and order. Piehl and Welk are entitled to qualified immunity.

Also entitled to qualified immunity is Sergeant Benjamin Kennelly, the forward commander on the scene who led the deescalation attempts. In his complaint, Mitchell wrongly accused Sergeant Kennelly of directing the deployment of bean bag munitions against him, but this has long since been proven false. Kennelly never directed anyone to deploy any munitions at any time. And at the moment Mitchell was injured, Kennelly was nearly 100 yards away, behind a concrete barrier too tall to see over, unaware of the decision to arrest Mitchell and the decision to use less-lethal force. Kennelly's sole connection with Mitchell's injury was his decision to radio for

an ambulance the moment he learned about it. Kennelly is entitled to qualified immunity on Mitchell's claim that he failed to intervene.

All of the material facts are undisputed and are comprehensively documented in the record. Indeed, much of the night is captured on video, including two instances of Mitchell's flight from the police as well as the moment of his injury. Confronted with these videos, even Mitchell was forced to admit that he moved away from police and that he kept returning to the bridge. In the face of the undisputed material facts showing the chaos which confronted the officers, and their use of the minimal force necessary to effect Mitchell's arrest under the circumstances, Appellees are entitled to judgment as a matter of law.

## ARGUMENT

### I.     Standard of Review

This Court reviews de novo the district court's grant of summary judgment on the basis of qualified immunity, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor. *Williams v. Decker*, 767 F.3d 734, 738–39 (8th Cir. 2014). Summary judgment is warranted when "there is no genuine dispute as to any material fact" and Sergeant Kennelly is entitled to "judgment as a matter of law." *Drew v. City of Des Moines*, 111 F.4th 881, 884 (8th Cir. 2024).

To preclude summary judgment, a factual dispute must both be genuine and concern a material fact. To show a genuine issue for trial, a party may not rely on mere denials or allegations in its pleadings. *Lonesome Dove Petroleum, Inc. v. Holt*, 889 F.3d 510, 514 (8th Cir. 2018). "The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) (citations omitted). Factual disputes that are "irrelevant or unnecessary" do not suffice. *Uhiren v. Bristol-Meyers Squibb Company, Inc.*, 346 F.3d 824, 827 (8th Cir. 2003) (citations and quotations omitted).

> In summary judgment, this court views the evidence and draws all reasonable inferences most favorably to the nonmoving party. *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022). However, only facts that are genuinely disputed are viewed most favorably to the nonmovant. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A fact is not genuinely disputed if a party's story is "blatantly contradicted by the record, so that no reasonable jury could believe it."

*Dimock , Tr. for Heirs of Dimock-Heisler v. City of Brooklyn Ctr.*, 124 F.4th 544, 549 (8th Cir. 2024) (citing *Scott v. Harris*, 550 U.S. 372, 380, (2007)).

In this action which turns on qualified immunity, Sergeant Kennelly and the other defendants are entitled to qualified immunity unless: "(1) the facts demonstrate the deprivation of a constitutional or statutory right, and (2) the right was clearly established at the time of the deprivation." *Drew*, 111 F.4th 881 (internal citations omitted). This Court may resolve the appeal solely under the "clearly established" element of the analysis. *Id.*

## II.    There Are No Genuine Issues of Material Fact.

Mitchell attempts to show a genuine issue of material fact in two ways. First, he misapplies the summary judgment standard and erroneously characterizes the legal questions facing the district court as factual disputes. Second, he misrepresents

the record to try to create a factual dispute on the question of whether protestors received warnings.

**A.    Mitchell Misapprehends the Summary Judgment Standard.**

Mitchell first errs by conflating questions of fact with question of law. His primary argument on appeal is that the district court "erred in concluding no genuine issues of material fact exist" on his excessive force claim. Opening Brief ("Brief") at 24. He then sets forth his claims of error: first, that a jury could conclude that a reasonable officer would not think Mitchell was engaged in serious crimes, *id.* at 27-36, second, that a jury could conclude that Mitchell did not pose an immediate threat to officer safety, *id.* at 36-45, and third, that a jury could conclude a reasonable officer would not think Mitchell was resisting or fleeing arrest. *Id* at 45-51. Accordingly, Mitchell asserts, "a reasonable jury could find that the officers' use of less-than-lethal force *at all* was excessive." *Id.* at 52. Mitchell appears to imply that the question of objective reasonableness under undisputed predicate facts is a question for the jury to decide.

Mitchell is wrong. On *this* record, the district court's conclusions regarding the wholly objective "reasonableness" inquiry are not findings of disputed fact – they are conclusions of law.

On a motion for summary judgment, the moving party has the burden of establishing the relevant predicate facts. *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010). Predicate facts include only "the relevant circumstances and the acts of the parties themselves, and *not the conclusions of others about the reasonableness of those actions*." *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000)

(emphasis added). Here, the predicate facts are simply the historical details of what actually happened, such as where Mitchell was physically located in relation to the officers, the conduct of all parties, the layout of Backwater Bridge, etc. These facts have been exhaustively established here, *see supra* at 1-21, and are undisputed.

Critically, once the predicate facts are established, "the reasonableness of an officer's conduct under the circumstances is *a question of law.*" *Malone v. Hinman*, 847 F.3d 949, 953 (8th Cir. 2017) (cleaned up). Here, because the predicate facts are established, Mitchell's arguments on the four points above are legal questions. This is aptly demonstrated in a 2020 opinion issued by this Court:

> The district court thought there were genuine disputes of fact about whether a reasonable officer in Cohen's position "would have perceived" that B.C. was running toward the officer before he fired . . . **We agree that these are important questions, but they are not questions of fact for a jury. Once the court has assumed a particular set of facts** about where and how B.C. was running in relation to Cohen's position, **whether B.C.'s actions rose to a level warranting Cohen's use of force is a question of law for the court,** not a question of fact.

*Liggins v. Cohen*, 971 F.3d 798, 800–01 (8th Cir. 2020).

So too here. The district court properly adopted the "particular set of facts" established by the undisputed evidence, and application of the objective reasonableness standard was a question of law. Mitchell cannot show a fact question precluding summary judgment by merely postulating that a jury could disagree with the Court's legal analysis about how a reasonable officer would have acted. This Court should reject Mitchell's attempt to recast these legal arguments as factual disputes.

**B.    Mitchell's Misreading of the Record Fails to Show a Dispute of Material Fact.**

The events of January 18 and 19, 2017, are not seriously in dispute. Copious amounts of eyewitness testimony, together with video evidence, permits reconstruction of the details of the night. *See supra* at 1-21. All facts material to the Fourth Amendment analysis are wholly undisputed.

Nevertheless, Mitchell attempts to create a fact issue by misrepresenting the record as it relates to the warnings given to protestors.[4] To review the undisputed facts on this point, the officers unanimously testified that frequent warnings, directives, and commands to disperse were issued to the protestors on the bridge that night. *See supra* at 10. There is no evidence in the record to the contrary. Mitchell's only testimony on the subject from the night in question is that he didn't recall any members of law enforcement directing him to disperse during the time period of the second push.[5] (App.321; R.Doc.111-4 at 237).

Regardless of this uncontroverted evidence, Mitchell attempts to create a dispute of fact on the subject. For instance, he asserts that "no officer communicated to protestors that the police planned to imminently arrest them," Brief at 8. In support, he cites the video taken from a handheld camera (App. 699) and claims it contains "no

---

[4] Mitchell's recitation of facts contains other errors as well, but like those related to the warnings given by law enforcement, they are easily resolved by consulting the record. For instance, Mitchell claims that Welk testified to the effect that officers would deploy less-lethal weapons at protestors "even when they had their arms raised above their heads." Brief at 3. But looking to the cited deposition transcript, Welk did not testify as indicated; he said he had witnessed the use of less-lethal weapons at the DAPL protests *in general*, not against protestors who had their arms raised above their heads.

[5] Of course, Mitchell did disperse when he moved away from the officers as the second push began.

warnings from law enforcement regarding trespassing, arrest, or potential use of force at all." Brief at 8. There are several problems with this claim. First of all, just because a particular command wasn't captured on a particular video doesn't mean it wasn't given. Presumably all sorts of things were said on the bridge during the six-hour protest which were not captured in this particular 98-minute video generated from a handheld camera recording a chaotic scene with lots of background noise. But even more simply, Mitchell's assertions are simply wrong: the video footage he cites *does* contain warnings, at least regarding trespass and use of force. *See id.* at 53:59 (officers yelling "Stay back" and "Go back to camp," followed by protestors defying their orders and marching forward anyway); *see also id.* at 1:06:57 – 1:07:01 (overlapping audio of commands sounding like "back up," "back up or you'll be shot with less lethals, "back up guys.").

Similarly, Mitchell tries to invoke the presence of "material disputed facts" regarding whether he was "told he was under arrest" when less-lethal was finally deployed against him. Brief at 47. First of all, whether Mitchell was told he was under arrest *in that moment* simply isn't material in light of the uncontroverted testimony that Mitchell and other protestors had received hours of warnings that they were violating the law and subject to arrest. And here again, the references Mitchell cites – to testimony of Kennelly, Piehl, and Welk – simply do not constitute a fact dispute. Brief at 47. Presumably, Mitchell means to set up a tension between the testimony of Kennelly – who explained that *during the night in general* all protestors had been informed they had committed offenses – and that of Piehl and Welk, who explained that *immediately before Mitchell was shot* they did not hear or remember a specific

28

instruction being given to him about arrest. But this is not a conflict; the officers were talking about different timeframes, and all officers agreed that frequent warnings were given throughout the course of the night, which is what actually matters.

Mitchell's attempts to create a fact dispute on an immaterial issue should be rejected by this Court. Turning to the legal analysis of the undisputed record, Mitchell fails to establish a violation of his constitutional rights, as set forth below.

## III. Defendants Are Entitled to Qualified Immunity on the Excessive Force Claim.

Because the record is undisputed, the question for this Court is whether Piehl and Welk are entitled to qualified immunity on Mitchell's claim of excessive force as a matter of law, and the answer must be "yes." To overcome their qualified immunity, Mitchell must make two showings: "(1) the facts demonstrate the deprivation of a constitutional or statutory right, and (2) the right was clearly established at the time of the deprivation." *Drew,* 111 F.4th 881. Viewing the record in the light most favorable to Mitchell, he cannot meet either of these elements.

### A. No Constitutional Right Was Violated Here.

The undisputed material facts show that, as a matter of law, Piehl and Welk did not use excessive force against Mitchell. To determine whether force used to seize a suspect was excessive and thus "unreasonable" for purposes of the Fourth Amendment, this Court considers "the totality of the circumstances," including factors such as: "the severity of the crime at issue," "whether the suspect poses an immediate threat to the safety of the officers or others," and "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Mitchell,* F.4th at 898, citing

*Graham v. Connor*, 490 U.S. 386, 396 (1989). Additional factors reviewed by this Court include "the relationship between the need for the use of force and the amount of force used" and "any effort made by the officer to temper or to limit the amount of force." *Cravener v. Shuster*, 885 F.3d 1135, 1138–39 (8th Cir. 2018).

The Supreme Court has cautioned that the reasonableness of any use of force must be judged from the perspective of an officer on the scene:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97 (internal citations omitted). Similarly, while the degree of injury resulting from a use of force might be relevant, it "should not be dispositive, because the nature of the force applied cannot be correlated perfectly with the type of injury inflicted." *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011). Rather, to determine whether force is excessive, the inquiry is simply reasonableness from the perspective of a reasonable officer on the scene. *Chambers,* 641 F.3d at 906.

Here, applying this law to the undisputed facts shows that the force deployed by Piehl and Welk was reasonable as a matter of law.

### 1. The Force Applied.

The particular force applied by Piehl and Welk must be precisely defined in order to fairly assess it in light the circumstances facing them. While Mitchell's arguments focus on chiefly on the extent of his injury, he glosses over the fact that

the undisputed evidence shows that both Welk and Piehl were aiming at his leg. Both Piehl and Welk testified that they aimed at Mitchell's lower extremities, and their testimony is undisputed. Accordingly, any unintentional deviation from such a target would, at most, be negligent conduct[6] which is not actionable under § 1983, even setting aside the possibility that the round which impacted Mitchell was deployed by someone else entirely. *See Roach v. City of Fredericktown, Mo.,* 882 F.2d 294, 297 (8th Cir. 1989) (officer's alleged negligence in pursuit of automobile did not rise to level of conduct which would sustain claim under § 1983 of excessive force).

Accordingly, the question before this Court is *not* whether it was reasonable for Piehl and Welk to deploy less-lethal munitions at Mitchell's eye. The question is whether it was unreasonable to deploy less-lethal munitions at Mitchell's leg. To ignore the uncontroverted evidence that Piehl and Welk never intended to hit Mitchell's eye would unfairly insert mere chance into the Fourth Amendment reasonableness inquiry. "The governing rule should not turn on such unpredictable and fortuitous consequences of an officer's use of force." *Chambers,* 641 F.3d at 906.

Mitchell's arguments to the contrary on this point are unavailing. He states that a defendant "need not have intended to cause the harm they did for an excessive force claim to proceed," because the excessive force standard "asks whether the officers' actions are objectively reasonable" without regard to intent. Brief at 53. But

---

[6] The record is also consistent with the beanbag round ending up in Mitchell's eye for some other reason, such as his own movement or the round's deflection off of the shield he was holding. However, the question of whether the beanbag struck Mitchell's eye because of negligence or Mitchell's own movement is legally irrelevant to this case, given the reasonableness of the officers' deployment given the circumstances they faced.

that is exactly the point: the inquiry focuses on the "*officers' actions.*" Here, the undisputed facts shows that the officers' actions were to aim their munitions at Mitchell's leg. Mitchell is not entitled to speculate that they had a subjective intention to hit him in the eye.

Further, Mitchell's citation to *Mitchell I* for the proposition that firing a lead-filled bean bag at a person is to use more than *de minimis* force against them simply does not help his case. Defendants are not saying they used *de minimis* force against Mitchell. They're saying that used force that was reasonable as a matter of law in light of the scene confronting them. The details of that scene are discussed next.

> ### 2.      Mitchell and the Other Rioters Posed an Immediate Threat.

In parsing the scene that faced the officers on the Backwater Bridge, one factor considered by this Court is whether Mitchell posed an "immediate threat" to the safety of officers or others. *Graham,* at 396. Here, any reasonable officer would have perceived their safety to be threatened by the actions of Mitchell and the rioters. All of the officers witnessed violent behavior repeatedly throughout the evening. *See supra* at 8-9. Further, Mitchell was physically resisting the officers' advance – standing behind a shield – at the moment force was deployed.

In *Bernini v. City of St. Paul*, the Eighth Circuit considered the Fourth Amendment claims of plaintiffs who were participants in a large urban protest in St. Paul, Minnesota. *Bernini*, 665 F.3d at 1000 (8th Cir. 2012). Its analysis is instructive here. Considering allegations that a sergeant deployed non-lethal munitions against protestors and thereby used excessive force, the Court concluded that the sergeant was entitled to qualified immunity, holding:

At a minimum, it was not objectively unreasonable for Henry to authorize the force deployed in light of clearly established law. The circumstances led officers reasonably to believe that a **growing crowd intended to penetrate a police line** and access downtown St. Paul. Henry's use and authorization to use non-lethal munitions to direct the crowd away from the intersection and toward a park where the crowd could be controlled did not violate clearly established rights.

The plaintiffs contend that it was unreasonable for the officers to continue to use force **as the crowd moved west on Shepard Road, because the crowd was "complying with the movement of the officers and posed no threat to the officers."** The video footage reveals, however, that some people would not leave the roadway and that some turned east and faced the officers. It was reasonable for the officers to deploy non-lethal munitions to keep all members of the crowd moving west.

*Bernini*, 665 at 1006.

*Bernini* stands for the proposition that even in a protest featuring some compliant individuals and some noncompliant individuals, the use of less-lethal munitions is reasonable to control the movement of the entire crowd. Of course, the use of less-lethal in *Bernini* is distinguishable from the use here, because in this case, Mitchell cannot argue he was ever compliant with law enforcement commands. These distinctions only highlight the objective reasonableness of the force exercised by Welk and Piehl: if it is reasonable for officers to deploy less-lethal munitions against a crowd despite the presence of some compliant members when the crowd overall poses a threat, surely it is reasonable to deploy less-lethal munitions against the noncompliant individual specifically.

**3.    Severe Crimes Were at Issue Here**.

Another factor which can be considered by this Court is the severity of the crimes at issue, as perceived by a reasonable officer. *Graham,* 490 U.S. at 396. By the time of the second and final push, many protestors in the crowd were subject to immediate arrest for multiple crimes: felony-level rioting, trespassing, simple assault, aggravated assault on peace officers, obstruction of a government function, actively resisting and evading arrest. And all of the remaining protestors were subject to immediate arrest for criminal trespass, obstruction of a government function, engaging in a riot, and resisting and evading arrest.

Mitchell's contention that he might have only committed several misdemeanors does not undermine the reasonableness of the officers' decision to deploy less-lethal munitions. First, one of the probable cause affidavits prepared in relation to Mitchell's arrest asserts probable cause to charge him with inciting a riot, a class C felony. (App.25-26; R.Doc.95-17). But even setting aside the felony rioting, the actions of the officers were still reasonable. Again, the touchstone of the Fourth Amendment is "reasonableness under the *particular circumstances* presented." *Bernini*, 665 F.3d at 1003 (emphasis added). In *Bernini*, the Court took into account the practical difficulties confronting officers when confronting a "large and potentially riotous group" when assessing the reasonableness of their arrests under the Fourth Amendment. The scenes described in *Bernini,* featuring protestors donning facial coverings, shielding themselves, and moving towards the officers, *id.* at 1001, are strikingly similar to scenes present in this case. *See, e.g.,* App.699, R.Doc. 111-12, at 53:56 (officers yelling "stay back" at line of protestors behind shields, followed by protestors defying their orders and marching forward anyway).

The Court in *Bernini* concluded, "From these actions, a reasonable officer could have concluded that the individuals at the intersection were acting together and that they intended to break through the police line in an attempt to access downtown St. Paul." *Id.* at 1004. Ultimately, the Court concluded it was reasonable for police to treat the protestors as a unit and believe that the group *as a whole* was committing one or more offenses. *Id.*

While no question of probable cause exists in the present case, this Court should take into account the sheer quantity of crimes being committed and the unified actions of the protestors when assessing the severity of the crimes faced by the officers on the Backwater Bridge. This factor weighs in favor of defendants and the reasonableness of their use of force.

**4.    Mitchell and the Others Were Resisting Arrest and Evading Arrest By Flight.**

Another *Graham* factor justifying the use of force here is Mitchell's resistance to arrest and his flight from the same. Mitchell admits that when the officers moved south down the bridge, he moved south down the bridge ahead of them, and that the officers never got close enough to grab him. App.316-318; R.Doc.111-4 at 231:2-231:23. And while Mitchell now portrays his evasive maneuvers as "keeping himself . . . safe," *Brief* at 46, he cannot explain away the video footage. *See supra* at 17. The district court correctly found Mitchell was fleeing arrest. Contrary to Mitchell's assertion, no reasonable jury could find otherwise.

Moreover, Mitchell had yet *another* opportunity to surrender once the officers pursued him to the southern edge of the Backwater Bridge, immediately before his

injury. But when he stopped fleeing, it was not to turn himself in, but to join the other protests in creating a shield wall to further resist law enforcement. By this point, for a period of hours, Mitchell had ignored verbal commands and warnings to leave the bridge, physically fled from the officers' attempts to seize him and take him into custody, and (for the second time) chose to resist from behind a line of shields. In light of the undisputed evidence that Mitchell was fleeing and resisting arrest, it was objectively reasonable as a matter of law for Piehl and Welk to use a deploy a single round of less-lethal munition at Mitchell's leg to obtain his compliance.

### 5. Other Factors.

Other factors considered by courts in the Fourth Amendment reasonableness analysis include "the relationship between the need for the use of force and the amount of force used," and, "any effort made by the officer to temper or to limit the amount of force." *Cravener v. Shuster*, 885 F.3d 1135, 1138–39 (8th Cir. 2018). These factors weigh overwhelmingly in favor of defendants.

By the end of the night, it would have been clear to any reasonable officer that use of some form of intermediate force was necessary to effect the arrest of Marcus Mitchell. For hours, he had defied law enforcement's verbal commands, evaded their attempts to physically grab him, and refused to simply disperse from the scene and go back to the camp. The "need for the use of force" was overwhelming, and by comparison, the "amount of force used" was the minimum amount necessary. Both Piehl and Welk testified that they deployed a single beanbag round at Mitchell's leg. Their decision to aim for the leg constitutes a clear "effort made by the officer to temper or to limit the amount of force." Indeed, the efforts of all law enforcement

for the preceding five hours constituted efforts to "temper or limit" the amount of force, considering their extensive attempts to deescalate before trying to arrest anybody. Mitchell had every opportunity to avoid the force used against him, but by the end of the night the officers simply had no other choice to enforce the law.

### 6. Conclusion as to Reasonableness.

Under the particular circumstances facing Welk and Piehl, it was eminently reasonable for both of them to deploy a single drag-stabilized beanbag round at Mitchell's leg. Any reasonable officer would have seen no viable alternative to effectuating his arrest and ending the riot. Based on the undisputed facts, this conduct was reasonable as a matter of law.

### B. Even if a Constitutional Right Was Violated, It Was Not Clearly Established.

A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). Critical here, this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*

To show a clearly established right, Mitchell must identify controlling precedent that an officer faced with a subject who has been breaking the law continuously for hours, who is part of a group violently rioting, and who has evaded arrest and continues to resist it, must not escalate even to a single bean bag round without violating the Fourth Amendment rights of the arrestee. This he failed to do. Mitchell attempts to analogize to *Marks v. Bauer*, but that case is distinguishable. In

*Marks*, an officer launched a projectile at a protestor from five to 10 feet away; it exploded in his eye, causing a traumatic brain injury. *Marks v. Bauer*, 107 F.4th 840, 843 (8th Cir. 2024). Even from this brief summary, *Marks* is already distinguishable from the case here, where Piehl and Welk were 60 feet away from Mitchell. Most salient is the *Marks* Court's discussion of whether the officer had violated a clearly-established right:

> The outcome would be the same even if Officer Bauer used less than deadly force by purportedly aiming for Marks' torso. After establishing a perimeter and evacuating the victim who was the subject of the dispatch, Officer Bauer, Officer Pobuda, and others successfully formed a new perimeter around a second injured victim. The video evidence shows that the crowd at this moment was compliant. Some members were assisting law enforcement. Another part of the crowd watched from a distance and recorded the events on their phones. **Unlike the individuals in *White v. Jackson*,** 865 F.3d 1064, 1072 (8th Cir. 2017)**, who were ordered to disperse** and who saw police forming a skirmish line to disperse them, the crowd present at this scene had never been given a dispersal order. This case is also **unlike the crowd in *Bernini v. City of St. Paul*,** 665 F.3d 997, 1001, 1006 (8th Cir. 2012)**, where officers suspected the individuals intended on penetrating the police line.**

*Marks v. Bauer*, 107 F.4th 840, 850 (8th Cir. 2024).

The protest scene in *Marks* is different than the protest scene in this case. The crowd on Backwater Bridge was not compliant, and had never been compliant for the past five hours. Certainly none of them were "helping law enforcement." The crowd in this case is more like the crowd in *White* – they had been ordered to disperse and saw the police forming a skirmish line. The crowd in this case is also more like the crowd in *Bernini*, as explained above. *Marks* does not create a clearly-established

right to be free of less-lethal force in *this* situation, where a noncompliant crowd has been given innumerable orders to disperse.

In sum, Mitchell can overcome neither Piehl nor Welk's right to qualified immunity. The judgment of the district court should be affirmed.

## IV. Kennelly's Qualified Immunity on the Failure to Intervene Claim Must Be Upheld.

There is simply no reason for Sergeant Kennelly to be in this case. When Mitchell was injured at the south end of the bridge, Kennelly was at the north end of the bridge behind a concrete barrier. Kennelly was unable to see or hear the bean-bags round being deployed. And Kennelly never directed any officer to deploy any bean bag rounds at Mitchell or anyone else. A *de novo* review of the undisputed record reveals that there are no genuine issues of material fact, and Kennelly is entitled to qualified immunity as a matter of law.

To reiterate, in order to overcome defendants' qualified immunity on any claim, Mitchell must show [1] a constitutional violation, and [2] that the right violated was clearly established as of January 18, 2017. *Beard*, 97 F.4th at 1114. In order to meet the first element – a constitutional violation – in the failure to intervene context, Mitchell must make three further showings: [1] that an *underlying* instance of excessive force occurred, *Peterson v. Heinen*, 89 F.4th 628, 640 (8th Cir. 2023), and [2] that Kennelly personally observed or had reason to know that excessive force would or was being used, and, [3] that Kennelly had both the opportunity and the means to prevent the harm. *Mitchell,* 28 F.4th at 901. Importantly, the underlying instance of force must not only be a constitutional violation, but a clearly established

one; otherwise, a bystanding officer is not "on fair notice that his failure to intervene would be unconstitutional." *Drew*, 111 F.4th at 885.

Even if Mitchell could show all of the above to meet the first element of a qualified immunity test, he must further show that Sergeant Kennelly's own conduct in failing to intervene violated clearly established law. *See Robinson v. Payton*, 791 F.3d 824, 829–30 (8th Cir. 2015) ("We find that a reasonable official . . . would not understand that what he is doing . . . violates clearly established law. His decision . . . not to intervene did not transgress a bright line.")

Notably, Mitchell's brief does nothing to address these required showings. He does not indicate how they could possibly be met on a record which so resoundingly confirms Kennelly's lack of involvement. Indeed, Mitchell does not even mention the substance of his claim against Kennelly in his opening brief; he merely asks that it be remanded so that Kennelly can face trial. Kennelly's entitlement to qualified cannot be so easily waved away. Judgment in his favor should be upheld by this court.

## A. Mitchell Cannot Show a Violation of a Constitutional Right.

Mitchell's allegations against Kennelly were summarized by this Court in in *Mitchell I*.

> [T]he complaint alleged that Sergeant Kennelly and the other officers were "dispatched to the scene and issued 12 gauge shotguns that deployed drag stabilizing bean bag rounds" and that Sergeant Kennelly acted as "scene commander" and "**directed" the other officers as they "deployed munitions" at the protestors.**

*Mitchell*, 28 F.4th at 901.

This Court reasoned that these allegations stated a claim for failure to intervene. First, because Kennelly allegedly "**observed and indeed 'directed'** the use of the bean bags prior to Mitchell's arrival," this Court concluded that Kennelly "had reason to know" that law enforcement would continue to deploy them after Mitchell arrived. *Id.* Second, because Kennelly was scene commander, the Court determined that he "had the opportunity and means to stop" the of use of beanbags against peaceful protestors before Mitchell's injury. *Id.*

All of these allegations have now been proven wrong. Applying the same standard to the actual facts yields the opposite result: Kennelly is entitled to dismissal on qualified immunity grounds.

### 1. Kennelly Did Not Observe the Use of Excessive Force.

On the first element, Kennelly did not "observ[e] or ha[ve] reason to know excessive force would be or was being used." *Mitchell,* at 901. First of all, contrary to Mitchell's allegations, Kennelly did not direct the use of force. Kennelly's uncontradicted testimony is that he never directed any officer to deploy their weapon on the night in question, and that in fact he had never directed an officer to use less-lethal munitions during the entirety of the DAPL protest response. *See* App.646, R.Doc.111-7; *see also id.* at 184:25-185:1 (Kennelly testifying "It's up to each individual officer to justify any time they use force.") This testimony is confirmed by the other defendants in this case, Piehl and Welk. Welk testified that Jason Stugelmeyer was the individual he was taking orders from that night, and it was Jason Stugelmeyer who had informed him that officers were going to use less-lethal

to take individuals into custody. Piehl testified that Sergeant Steele had identified Mitchell to be arrested. The evidence in the record is unanimous that Kennelly did not direct anyone to deploy less-lethal munitions, and certainly not against Marcus Mitchell.

Second, Kennelly neither observed nor had reason to know that excessive force was being used. First, there is the matter of Kennelly's location on the bridge. When Mitchell's injury occurred, Kennelly was almost 100 yards away on the other side of a concrete barrier too high to see over. He could not see what was happening on the opposite side of the bridge, and he also did not hear any bean bag rounds going off, due to the volume of the protest scene. Again, the testimony of the other officers supports this. Sergeant Piehl, when viewing the video of the moments before Mitchell's injury, testified audible orders couldn't have come from Kennelly, because "Kennelly was never out here." Furthermore, when Kennelly gave the direction for the push on the north side of the barricade, there was no discussion about specifically who among the protestors should be arrested.

Lastly, excessive force observed by an officer must be clearly-established in order to support liability for failure to intervene, because otherwise an officer would not be on notice of his constitutional duty to stop the force. In the context of this case, this is simply impossible. Again, the question of whether or not force is excessive depends on the "totality of the circumstances." In answering this question,

this Court has the benefit of depositions, video footage, and other eyewitness evidence from multiple individuals who saw the force occur. How could Kennelly, nearly 100 yards away from Mitchell in the middle of the night, have known whether the force was excessive or reasonable when he literally could not perceive any of the relevant circumstances confronting the officers on the south side of the bridge? As a matter of law, this Court should recognize that Kennelly did not observe or have reason to know of the allegedly excessive force.

**2.      Kennelly Had Neither the Opportunity nor the Means to Intervene.**

Equally fatal to Mitchell's claim is Kennelly's inability to have prevented the allegedly excessive force. In *Mitchell I,* this Court cited the case of *Krout v. Goemmer* for the proposition that even five minutes was "a period which a jury could find sufficient to afford the **onlooking officers** an opportunity to intervene." *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009). But discovery has revealed that Kennelly simply wasn't an onlooking officer. Lacking contemporaneous knowledge of the events at the other side of the bridge, he would have had no opportunity to intervene. An officer who lacks the actual opportunity to intervene cannot be held liable for excessive force. *See, e.g., Grider v. Bowling* 785 F.3d 1248, 1253 (8th Cir. 2015) (("Grider does not put forward any evidence showing Officer Bowling was aware of the kick before it occurred or had the opportunity to take action to

deescalate the situation") (internal quotations omitted). As a matter of law, Kennelly cannot be found to have had the opportunity or means to intervene.

In short, viewing the facts in a light most favorable to Mitchell, it is abundantly clear that Kennelly cannot be held liable for failure to intervene even if there had been excessive force (which there was not). As such, Mitchell cannot meet the first element of the qualified immunity test, and judgment in favor of Kennelly must be affirmed.

**B.      Mitchell Cannot Show That Any Right Was Clearly Established**.

Even if Mitchell could show that Kennelly violated a constitutional right, which he cannot, Mitchell is still unable to meet the second requirement for defeating Kennelly's qualified immunity – *i.e.*, that the right is "clearly established." To show that a right is clearly established, a plaintiff must demonstrate that "existing precedent [has] placed the statutory or constitutional question beyond debate." *Lombardo v. City of St. Louis*, 38 F.4th 684, 690 (8th Cir. 2022). The inquiry "must be undertaken in light of the *specific context* of the case, not as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). Mitchell must show that "various courts have determined that certain factually similar conduct is a constitutional violation." *Dixon v. Lowery*, 302 F.3d 857, 861 (8th Cir. 2002).

But it is impossible to identify what conduct of Kennelly must be analyzed, because the evidence is so overwhelming that Kennelly violated no right at all. As explained, Kennelly did not know, and had no way to know, about the allegedly

excessive force being deployed against Mitchell. Kennelly's only affirmative conduct which is even tentatively connected to Mitchell's injury would be his decision to seek approval from the TOC to allow law enforcement to make arrests. But it is not a violation of clearly established law to direct law enforcement officers to carry out arrests. An officer may arrest individuals for even very minor criminal offenses committed in his presence as long as he has probable cause. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Here, the officers had probable cause for multiple serious offenses. Kennelly's communication of the TOC's approval to carry out arrests did not violate any clearly-established Constitutional right.

Ultimately, Mitchell's problem with Kennelly's conduct appears to be that Kennelly was "trying to maintain law and order." *Mitchell*, 28 F.4th at 897. But the very act of law enforcement cannot, in itself, be unlawful. Mitchell cannot show that Kennelly violated a clearly-established Constitutional right, and cannot defeat his entitlement to qualified immunity. Judgment in favor of Kennelly should be upheld.

## V.      CONCLUSION

For all of these reasons, Kennelly respectfully requests that the judgment of the district court be affirmed.

Dated this 31st day of January, 2025.

State of North Dakota
Drew H. Wrigley
Attorney General

By: /s/ Jane G. Sportiello        By:    /s/ Courtney R. Titus
Jane G. Sportiello                           Courtney R. Titus
Assistant Attorney General            Assistant Attorney General
State Bar ID No. 08900                State Bar ID No. 08810
Office of Attorney General             Office of Attorney General
500 North 9th Street                    500 North 9th Street
Bismarck, ND 58501-4509          Bismarck, ND 58501-4509
Telephone (701) 328-3640          Telephone (701) 328-3640
Email jsportiello@nd.gov            Facsimile (701) 328-4300
                                     Email ctitus@nd.gov

**Attorneys for Benjamin Kennelly, North Dakota Highway Patrol Sergent.**

# CERTIFICATE OF COMPLIANCE

## Civil No. 24-2755

The undersigned hereby certifies that this Brief conforms with the type-volume limitations of Fed. R. App. P. 27(d) and that the text of this brief contains 12,750 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 word processing software in Times New Roman 14 point font. The brief has been scanned for viruses and is virus-free. I further certify that the digital version of this brief was generated by printing to PDF from the original word processing file so that the text of the digital version of the pleading may be searched and copied in compliance with this Court's Local Rule 25(A).

Dated this 31st day of January 2025.

State of North Dakota
Drew H. Wrigley
Attorney General


By: /s/ Jane G. Sportiello            By:      /s/ Courtney R. Titus
    Jane G. Sportiello                          Courtney R. Titus
    Assistant Attorney General                  Assistant Attorney General
    State Bar ID No. 08900                       State Bar ID No. 08810
    Office of Attorney General                  Office of Attorney General
    500 North 9th Street                         500 North 9th Street
    Bismarck, ND 58501-4509                      Bismarck, ND 58501-4509
    Telephone (701) 328-3640                     Telephone (701) 328-3640
    Email jsportiello@nd.gov                     Facsimile (701) 328-4300
                                                 Email ctitus@nd.gov

                                     Attorneys for Benjamin Kennelly, North Dakota Highway Patrol Sergent.

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

Civil No. 24-2755

Marcus Mitchell,

*Appellant,*

v.

Kyle Kirchmeier, et al.,

*Appellees.*

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NORTH DAKOTA
(NO. 1:19-CV-00149)
HONORABLE JUDGE DANIEL MACK TRAYNOR**

---

## CERTIFICATE OF SERVICE

---

I hereby certify that on January 31, 2025, I electronically submitted **BRIEF OF APPELLEE BENJAMIN KENNELLY, NORTH DAKOTA HIGHWAY PATROL SERGENT** to the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system and that ECF sent a Notice of Electronic Filing to all participants who are registered CM/ECF users.

Dated this 31st day of January, 2025.

State of North Dakota
Drew H. Wrigley
Attorney General

By:    /s/ Jane G. Sportiello
Jane G. Sportiello
Assistant Attorney General
State Bar ID No. 08900
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Email jsportiello@nd.gov

Attorneys for Benjamin Kennelly, North
Dakota Highway Patrol Sergent.